Jones, Chief Justice,
delivered the opinion of the court:’
This is a suit for material furnished and work performed under a contract that was canceled before completion.
On April 29, 1942, plaintiff entered into a contract with defendant through the Corps of Engineers of the War Department to install an electric distribution system at the air base, Syracuse, New York. The contract work consisted of removal of existing poles, installing transformers, street lighting equipment, aerial and underground cables, and the reconditioning and reinstalling of existing equipment. It was necessary to install approximately 1,000 poles, including the removing and relocating of 254 existing poles.
Approximately 80 percent of the plaintiff’s work was to be performed in what was termed the cantonment area of the air base. The drawings indicated rectangular streets and *182 runways, but these streets and runways had not actually been laid out and were not actually in existence but were being constructed during the period of the contract work. The balance of the work which plaintiff had contracted to do was mainly through fields along country roads or bordering the airport runways and parking stand. The defendant was endeavoring to construct an air base within a limited time. About 40 contractors were engaged in performing various parts of the construction work. There were existing power lines, together with distribution lines and high tension lines, electrically energized. Under plaintiff’s contract lines were to be removed and new installations made. The work was to be finished within 90 days. On April 30, 1942, plaintiff was given telegraphic notice to proceed with the work within five calendar days from receipt thereof.
The drawings failed to show which of the existing poles and installations or existing lines were to be removed. Except at one point they failed to show dimensions or distances between poles. Under section 1-15 of the specifications bench marks and base lines were to be furnished by the defendant to the contractor. With these it would have been possible for plaintiff to determine the approximate location of the installations, but plaintiff was unable to preform its work until appropriate designations were made by the defendant.
Plaintiff submitted with its bid a proposed progress schedule or plan of operation reading as follows:

Proposed method of oferation and rate of frogress.

1 to SO days.

Eemoval of poles, cross arms, wires and transformers.

W to SO days.

Installing poles, cross arms, guys and anchors.

SO to 80 days.

Stringing wires.

Ifi to 80 days.

Installing transformers.

80 to 90 days.

Switchgear.
We propose to operate with four independent line crews, working from four separate line trucks.
We propose to sublet trucking, hauling and rigging of heavy equipment.
*183 According to the planned schedule the first work was to be the removal of poles, cross arms, wires and transformers, which plaintiff planned to do within the first 30 days of the contract period. At the conference on May 5 and 6, 1942, plaintiff requested drawings designating poles to be removed, dimensions and points for installation. Plaintiff also asked for detailed drawings because it had previously placed its orders for approximate quantities of critical materials based on bid quantities shown in specification 1-05 and wished to obtain information so as to release its orders for definite quantities.
Mr. Fremow, chief of the Operations Division, advised plaintiff that the Government had determined to make changes in the design of the project and that revised drawings would be furnished shortly. Plaintiff protested that such changes would hold up its schedule and delay it in obtaining desired definite quantities of material for which it had already placed orders, but which orders had not been released for shipment.
From time to time plaintiff asked for detailed drawings giving the information needed, and on May 11, 1942, Mr. Fremow furnished plaintiff with a list indicating increases and decreases from the original quantities shown in bid specification 1-05. Plaintiff went over this list and advised defendant that it was erroneous, calling attention to the third item which specified a decrease of 281 thirty-five-foot class 5 poles, whereas the original bid called for 245 such poles. Also items 27 and 28 which in the bid called for 7,750 feet of wiring, and which according to defendant’s list was to be reduced by 39,200 feet, the reduction thus being 32,000 feet more than had been called for in the original bid. Plaintiff was directed to wait for the revised drawings.
On May 16, 1942, plaintiff was furnished with two sets of revised drawings which did not show dimensions, base lines or bench marks. These drawings were marked “preliminary” but plaintiff was advised that they were satisfactory to be followed for the work to be performed.
On May 12, 1942 for the first time, defendant designated certain poles and installations in the cantonment area to be removed. These were the first items available for removal. *184 These poles and installations were all in use carrying live wires and could not be removed until the local light company deadened the lines. Plaintiff requested the defendant to have the power company deaden the lines and this was accomplished on Saturday, May 16,1942.
On Monday, May 18, plaintiff started to work with a crew of 11 men, a truck and tools, removing some poles and the installations on the poles with the equipment on hand and carried on this work until May 25 when it received special equipment for the work which it completed on May 27,1942. There were 73 poles and installations designated for removal and these were removed.
On May 25,26, and 27 defendant gave plaintiff1 sketches for certain installations and plaintiff proceeded to perform that work. No other poles and installations were ever designated by the defendant for removal because they were in use supplying current to various offices and contractors. The poles and installations that were designated as laid out by the defendant and installed by plaintiff were found to be several hundred yards from locations as indicated on the drawings, and did not follow the drawings.
On May 25 plaintiff was also engaged in constructing lines to the warehouse as designated by the defendant and installation appears to have progressed from that date. May 29 and thereafter, plaintiff, in addition to the contract work, was engaged in unloading carloads of poles and a carload of transformers. The work of unloading and installation appears to have continued from May 29 to June 6, 1942, when work was stopped.
There was some difficulty in determining the length of underground cable from the drawings. Terminal points had been designated but the location of poles had not. Plaintiff also claimed that there had been no bench marks or dimensions shown from which measurements could be made. The record, however, does not show whether any appreciable over-all work delay was caused by this delay in determining the length of the cable.
Defendant contends that plaintiff failed to ask for bench marks or other points of reference. However, plaintiff complained that it was being delayed and asked for drawings *185 and data which would enable it to proceed with the contract work of removal and installation items. Plaintiff also asked for ten sets of drawings called for in paragraph 1-04 (c) of the specifications. These were never furnished to plaintiff. The proof is that the first removal work that was ready for plaintiff was on May 18,1942.
About May 20, 1942, plaintiff wrote the defendant a letter requesting an extension of 19 days’ contract time. Defendant’s project engineer replied, declining to grant such extension and stating that plaintiff had not made suitable progress due to lack of sufficient labor and equipment.
The contracting officer, Major Dudley, called a meeting with plaintiff’s president, Mr. Feldman, and others, and stated that he was dissatisfied with plaintiff’s progress. Mr. Feldman stated at the meeting that he was having difficulty in ascertaining definite quantities from the sets of drawings furnished and that labor difficulties had also caused him some trouble. About June 1 plaintiff’s president discharged one Staunton, a foreman, and employed another man, whereupon all the men walked off the job. The reason for Staun-ton’s discharge is in controversy, plaintiff claiming that he was slowing down the work. This, however, was denied.
When plaintiff discharged Staunton he employed nonunion men on the project and the contract with the union was thereupon canceled by the union. Plaintiff proceeded with the contract work using nonunion labor. When the contract was first awarded the plaintiff’s president had called on the business manager for the electrical workers’ union No. 1249. The union at first declined to furnish plaintiff with men but after a conference in which a labor relations officer for the United States Army Engineers participated, gave plaintiff a temporary contract.
According to Major Dudley about half of the men who were working under the various contracts in connection with the building of the air base were union men and about half were nonunion. In many instances they were working side by side. This would not ordinarily have been done, but these were war days, it was difficult to secure the necessary manpower, and the need for facilities at the time was great, *186 which tends to explain the use of union and nonunion men on the same project.
There followed some correspondence as to what was the cause of the delay in the progress of the work. As late as June 6, 1942, the date that defendant canceled plaintiff’s contract as hereinafter described, defendant directed plaintiff in writing to cancel the order for certain material and to place its order for certain other material.
The confusion that arose was perhaps somewhat natural. The defendant in directing the work on the entire project was endeavoring to designate for only a day or so ahead for each of the contractors engaged so as to coordinate the work of the 40 or more contractors who were carrying on different phases of the work at the same time and thus prevent any contractor’s work from interfering with that of others. This procedure by the defendant, while doubtless necessary, tended to prevent plaintiff from making more progress with the type of work it was doing. Major Dudley, while an experienced engineer, was serving as contracting officer for the first time.
On June 2,1942, the contracting officer called a conference with plaintiff and plaintiff’s surety with representatives of the Government. Major Dudley stated that he was dissatisfied with the lack of progress and plaintiff contended that the plans for the work were inadequate, that grading operations prevented work, that proper information and bench marks were not furnished by the defendant, and that up to that time only about 70 poles were designated for removal and pencil sketches had been used to carry on the work.
There is evidence on the part of the defendant that Major Dudley, the defendant’s contracting officer, gave plaintiff a period of two or three days within which to determine whether or not it would be able to conduct certain operations which he felt would bring the contract work up to a certain point of progress. This is disputed by evidence on plaintiff’s part. The evidence as to much that occurred at these conferences is irreconcilable. While the defendant’s evidence indicates that there were other contractors on the project using nonunion as well as union labor, there was some discussion as to whether the union workmen employed by other contractors *187 on the job might strike if plaintiff continued to use nonunion labor.
On June 6, 1942, Major Dudley discussed the situation with some of his own officers and employees. One of the things discussed was whether the workmen of the other contractors might strike if plaintiff continued to use nonunion labor.
Defendant contends that up to that time plaintiff had completed only 0.4 percent of the contract work. Plaintiff contends on the other hand that it had completed approximately 10 percent of the work. A considerable amount of work was in process of completion and some of it was entirely completed. The proof indicates that about 5 percent of the work had been done. At any rate, the contracting officer decided to terminate the plaintiff’s right to proceed, and the contracting officer instructed his chief clerk to prepare letters of termination and a telegram to plaintiff’s surety notifying it of such termination.
Two articles in the contract dealt with cancelation. Article 9 was the standard provision which authorized the defendant to terminate the contract if the contractor refused or failed to prosecute the work with such diligence as would insure its completion within the time specified, and that in such event the Government might take over the work and prosecute the same to completion by contract or otherwise, making the contractor and his surety liable to the Government for any excess costs occasioned thereby. Article 23 of the contract provided that the Government might terminate the contract at its convenience by simply notifying the contractor in writing specifying the date from which such termination should become effective. It stipulated that termination should be effective from the date and to the extent specified in such notice. This article did not require the Government to assign any reason for such termination. The article stipulated, however, that in such event the contractor should discontinue all work, cancel all existing orders and subcontracts, transfer to the Government all materials and supplies, and take such other action as might be necessary to secure to the Government the benefits of any rights remaining in the contractor under orders or subcontracts chargeable *188 thereto. It stipulated further that when such action was taken the contractor should be reimbursed for all actual expenditures certified by the contracting officer, including expenditures made in connection with any portion of the contract, and that the contractor should be reimbursed for any expenditures in settling or discharging any outstanding contractual obligations or commitments. It also provided for paying the contractor on a pro rata basis the estimated profits.
Under date of June 6, 1942, the contracting officer wrote the plaintiff a letter stating that he was canceling the contract in accordance with Article 23 of the contract, and directing it to transfer to the Government all materials, supplies, and other facilities. The letter followed in large measure the provisions of Article 23, and advised the plaintiff that it would be reimbursed for work performed on this contract and for materials and supplies which it turned over to the Government in accordance with its terms.
Telegrams dated the same day were sent to the surety company advising it that the Line Construction Company had been notified that its right to proceed under the contract had been terminated. One of these telegrams asked to be advised whether the surety company desired to take over and complete the work, and further stated that if not advised by 12:01 p. m. of June 8 it would be assumed that the United States was to take over the work.
The other telegram stated that the contract had been terminated due to the failure of the Line Construction Company to initiate construction within the time required in the contract. It gave until 2:00 p. m. June 8 to furnish reasons why the contract should not be completed by immediate negotiation of contract with another concern, excess cost to be at surety’s expense.
Major Dudley testified that he considered the letter a matter of considerable importance; that he read it carefully before signing it, and that before signing he had observed the last words in the letter to the effect that plaintiff would be reimbursed for work performed on the contract and for materials and supplies turned over to the Government in accordance with the terms of the contract.
*189 The record does not show whether he read the telegrams which were sent. However, the letter was signed J. H. Dudley, Major, Corps of Engineers, Area Engineer, while the telegrams were simply signed Dudley, U. S. Engineers, and Dudley, Contracting Officer, U. S. Engineers. He had authorized the preparation of the letter and telegrams, which are set out in finding 89.
On June 9,1942, some one in the organization advised the contracting officer that he thought the contract should have been terminated under Article 9 instead of under Article 28, whereupon the contracting officer wrote the plaintiff another letter, advising it that its right to proceed was not terminated in accordance with Article 23 of the contract, but under the provisions of Article 9, due to its failure to commence operations and maintain the rate of progress as stipulated in Article 1 thereof.
The plaintiff’s president had gone to New York and claims he did not receive this letter until June 12.
In the meantime, under date of June 10, 1942, plaintiff wrote Major Dudley that in accordance with his letter dated June 6, 1942, notifying plaintiff that its contract was terminated, plaintiff enclosed two copies each of inventories of materials, apparatus and equipment delivered to the job. The letter stated that items covered by inventory sheets 1, 2, and 3 had been physically inventoried by Mr. Lynch of defendant’s materials department on June 9, and that items covered by inventory sheets 4, 5, and 6 had been inventoried by Mr. Schmerhorn during the week of June 6,1942.
The defendant did not certify the actual expenditures made by plaintiff with regard to the contract as provided for under Article 23.
At the date of the termination of the contract plaintiff had paid or become liable for $28,946.88, according to the report of the FBI auditor. Plaintiff claims additional sums but this is the amount of the items certified by the auditor.
After the termination of plaintiff’s contract the work was completed under a contract for the unfinished work let to the Welsbach Street Lighting Company of America under date of June 9, 1942. This was a lump-sum contract, the consideration being $209,733.72. The specifications provided for *190 the identical work under the revised drawings of May 16, 1942, as in plaintiff1’s contract. The defendant permitted the Welsbach Company to use the materials, appliances, and facilities plaintiff had left on the site of the work. In performing its work the Welsbach Company at all times requested and received location points of the United States Engineers and the inspectors in order to carry on its work. It finished its work within the time required. The excess cost under the Welsbach Company contract was $69,298.03, which amount, less the allowance for materials, defendant claims in a cross action against the plaintiff.
The more we read this record the more defendant appears to be off base and the less tenable its position becomes.
There is no doubt that the letter of June 6, 1942, had the effect of canceling the contract under Article 23. The article is plain. The contract provision is clear. The letter follows closely the provisions of Article 23. It was read by the contracting officer. He testified that he understood its importance ; that he had read all of it carefully, including the last provision which promised the plaintiff compensation for the work performed and the materials furnished by it. True, one of the telegrams that went out the same day to the surety company referred to the contract as having been canceled for failure to make progress. Apparently the contracting officer had not paid any attention to this telegram, and did not claim to have read it. He merely ordered that a telegram be sent to the surety advising it of his action in notifying plaintiff that its right to proceed had been canceled.
This was not a mistake on his part. He understood thoroughly what he was doing. He so testified. His only excuse was that he was not familiar with another provision of the contract which it is asserted would have enabled the Government to cancel on another ground. This appears to us as a rather flimsy excuse for a three-day later change in,the attitude of the Government. It seems clearly an election of the courses to be pursued and a subsequent change of mind and an effort to change the course of procedure. In the meantime, the plaintiff had acted. It had made a list of materials and the amount claimed for the work and presented it to the de *191 fendant on the day following the date of the second letter which the contracting officer had written.
There is no question here of mutual mistake. There is no claim that plaintiff or any of its representatives undertook to mislead the defendant. The letter was prepared under the instructions of the contracting officer and by some of the officers and employees who were working with him. Its contents were not shown to the plaintiff before the letter was mailed to it. It does not come within the limits of any exceptions that we can find laid down in the books whereby a man may escape the consequences of his act. Wigmore On Evidence, Vol. 4, Section 2415 and cases cited.
True, the contracting officer says he had not had a chance to become entirely familiar with the other provisions of the contract. While it was his first assignment as a contracting officer, he had been clothed with that responsibility. This is not offered in criticism. No doubt he was an efficient officer. There was a great shortage of manpower. There was need for speed on account of the claims and demands of a great war. There were more than two score of other contractors on the same job. This was a very difficult assignment, but certainly the contracting officer should be held to familiarity with the plain provisions of the contract which he was administering. There is no basis either in law or in equity for permitting defendant to escape the consequences of the action that was taken.
Even if there were an escape for the Government from the action which it took, it is altogether doubtful in the circumstances of this case whether it had a right to terminate the contract under Article 9. The defendant had affirmatively delayed plaintiff from proceeding with its contract for approximately 20 days as shown by the findings of fact. The plaintiff had submitted its schedule of progress setting out the order in which it expected to perform the work and this schedule had been approved by the contracting officer or his representative. The first work that was to be done was to remove and relocate the existing poles. There was delay in designating any of these poles and only a small percentage of the poles to be removed was ever designated. The location of such poles, as well as the new ones that were to be installed, *192 had to be designated. The locations could not be found from the drawings and specifications. Information of this character was repeatedly requested. It was not furnished. There were no bench marks. The plaintiff could not go prowling over the field where energized wires were located until he found just where his construction was to go and until the wires had been deadened. The defendant was almost wholly to blame for the delays that occurred. The defendant, therefore, probably did not have sufficient grounds to -justify it in terminating under Article 9 plaintiff’s right to proceed with the work.
It is not surprising that this condition should.prevail. To keep 40 different contractors going at the same time without interfering with each other would have been a severe test for an experienced contracting officer. It must have been doubly difficult for this officer who was having a new experience in that particular field.
The report of the FBI auditor was that the material that had been furnished and the work that had been performed amounted to $28,946.88. According to the provisions of the contract the plaintiff is entitled to recover this amount. The provisions of -Article 23 also require that plaintiff be compensated an amount of the anticipated profits based on the percentage of the work actually performed. Plaintiff claims $2,000 as representing the profit which it had earned. However, in view of the amount of plaintiff’s contract and the excess required to secure a completion of the contract we find that plaintiff would have made no profit. In fact, it. is probably fortunate for it that the Government saw fit to cancel, as it likely would have lost money had it been permitted to finish the work.
The plaintiff is entitled to recover the sum of $28,946.88, and the defendant is not entitled to recover on its cross action, which is dismissed. It is so ordered.
Madden, Judge; Whitaker, Judge; and Littleton, Judge, concur.