**SALSBURY INDUSTRIES, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 481–85C.

United States Claims Court.

May 17, 1989.

48

Eugene R. Fidell, Washington, D.C., for plaintiff. Edward S. Wactlar, of counsel.

E. Richard Southern, Washington, D.C., with whom were Asst. Atty. Gen. John R. Bolton, David M. Cohen, Director, and Thomas W. Petersen, Asst. Director, Washington, D.C., for defendant. David P. Hendel, U.S. Postal Service, of counsel.

## OPINION

ANDEWELT, Judge.

In this government contract action, plaintiff, Salsbury Industries (Salsbury), alleges that the United States Postal Service (Postal Service) breached its contract with plaintiff for the production and delivery of aluminum post office lockboxes. This action is presently before the court on cross-motions for summary judgment. For the reasons explained herein, plaintiff's motion for summary judgment is denied, and defendant's cross-motion is granted.

## Facts [1]

The contract in issue arose out of a May 20, 1982, solicitation by the Postal Service (Solicitation No. 104230–82–B–0068). The solicitation requested bids for the manufacture and delivery of aluminum post office lockboxes that would be installed in post offices for rental to the public. Salsbury and eight other firms submitted bids. On January 28, 1983, Salsbury and four of the other bidders were awarded contracts. One of the unsuccessful bidders, Doninger Metal Products Corporation (Doninger), had not been permitted to submit a "best and final offer" because the contracting officer had determined that Doninger was not a responsible offeror.

Salsbury's contract required it to produce and deliver a definite quantity of lockboxes at a contract price of $9,703,877.84 in accordance with a specified delivery timetable. To encourage early performance, the contract contained an incentive clause that provided an additional ten percent payment for lockboxes delivered ahead of schedule. Plaintiff began making deliveries pursuant to the contract and all of the lockboxes delivered prior to termination of the contract qualified for the delivery incentive.

On September 15, 1983, Doninger filed suit in the United States District Court for the District of Columbia challenging the contracting officer's determination that Doninger was not a responsible bidder. In its complaint, Doninger requested, *inter alia*, an injunction requiring the Postal Service to terminate for convenience all contracts awarded under the solicitation and to either award a lockbox contract to Doninger or issue a new solicitation for lockboxes. The Postal Service advised Salsbury of the existence of Doninger's suit, but Salsbury did not seek to intervene.[2]

In an order dated January 9, 1984, the district court held that the contracting officer's finding of nonresponsibility was the product of an unlawful *de facto* suspension of Doninger by the Postal Service. The court ordered the Postal Service to take the following action:

[D]efendant United States Postal Service shall forthwith suspend the performance of so much of the contracts awarded pursuant to [the solicitation] as would have been awarded to [Doninger] in January 1983 had [Doninger's] offer been accepted in full and award an aluminum door lockbox contract to [Doninger] in accordance with that offer.

*Doninger Metal Products Corp. v. United States Postal Service*, Civil No. 83–2725 (D.D.C. Jan. 9, 1984) (order denying defendant's motion to dismiss).

On January 12, 1984, the Postal Service, by telex, issued a stop-work order to plaintiff and the other four firms that had received lockbox contracts. The stated rationale for the stop-work order was "to implement the order of the United States District Court for the District of Columbia [in the *Doninger* case]." In the stop-work order, Salsbury was told: (1) not to accept any further delivery orders from the Postal Service or order any new materials; (2) to take inventory of all raw materials and lockboxes (including those in progress and those on hand and ready for shipment); and (3) to complete only the boxes that were on the assembly line.

By telex, dated January 27, 1984, the contracting officer notified plaintiff that for the balance of the quantity of lockboxes due, plaintiff's contract was thereby "terminated for the convenience of the Postal Service pursuant to clause 8 of the General Provisions for Fixed Price Contracts." Clause 8 provided, in pertinent part:

(a) The performance of work under this contract may be terminated by the Postal Service in accordance with this clause in whole, or from time to time in part, whenever the Contracting Officer shall determine that such termination is

---

1. The facts material to the granting of defendant's cross-motion for summary judgment are not in dispute.

2. Salsbury contends that it did not seek to intervene in Doninger's suit because the contracting officer indicated that the suit was frivolous and had no bearing on Salsbury's contract. The contracting officer, however, does not recollect making any such comments.

in the best interest of the Postal Service. Any such termination shall be effected by delivery to the Contractor of a Notice of Termination specifying the extent to which performance of work under the contract is terminated, and the date upon which such termination becomes effective.

The January 27, 1984, notice of termination was confirmed by a letter from the contracting officer dated January 31, 1984, which explained the steps plaintiff should take in view of the termination for convenience.

Prior to the notice of termination, plaintiff had produced and delivered nearly half of the units required by its contract and had earned over $260,000 in delivery incentives. Subsequent to termination, the Postal Service authorized plaintiff to deliver all units that had been finished but not yet delivered. On February 6, 1984, Doninger was awarded a lockbox contract for in excess of $15 million.

Thereafter, plaintiff submitted to the contracting officer a series of certified claims relating to its terminated contract. Plaintiff's first claim, submitted May 30, 1984, sought $112,639.09 in delivery incentive payments allegedly earned prior to termination. In a final decision dated September 4, 1984, the contracting officer allowed $23,745.75 of that claim to cover the incentives earned on those lockboxes actually delivered prior to the January 27, 1984, termination. The contracting officer denied the remaining $88,893.34 of the claim, which sought delivery incentives for lockboxes that were manufactured prior to termination but delivered, pursuant to the Postal Service's authorization, after termination. The contracting officer reasoned that the delivery incentive provision of the original contract did not apply to post-termination deliveries and that lockboxes delivered after termination were subject to the provisions of the termination for convenience clause, which did not contain an incentive clause.

After a series of negotiations, on December 7, 1984, the parties executed a termination settlement agreement which granted plaintiff an additional $3.4 million, bringing plaintiff's total payments under the contract to slightly over $8 million. The agreement provided that the $3.4 million settlement payment, combined with prior payments, "constitute[d] payment in full and complete settlement of the amount due the contractor by reason of the complete termination of work under the contract and of all other claims and liabilities of the contractor and the Postal Service under the contract, except as hereinafter provided [i.e., reserved]." The settlement agreement does not contain a specific or express reservation relating to the $88,893.34 claim denied in the contracting officer's final decision of September 4, 1984. It does, however, contain a stipulated reservation of a separate claim by plaintiff, which had not yet been presented in certified form, for $630,767 in incentive payments. The settlement agreement was incorporated in the contract through a January 2, 1985, contract modification.

On March 25, 1985, plaintiff submitted a certified claim to the contracting officer covering the $630,767 in delivery incentives specifically reserved in the January 2, 1985, modification. The claim sought delivery incentives for the remainder of the lockboxes due under the original contract, i.e., the lockboxes Salsbury never produced or delivered but would have been obliged to produce and deliver had the contract not been terminated.

In a final decision issued on June 3, 1985, the contracting officer denied plaintiff's claim for $630,767 and concluded that the delivery incentive clause in the contract did not apply to deliveries made after the contract had been terminated for convenience. However, based on a recalculation of the incentive payments due for pretermination deliveries, the contracting officer granted plaintiff $1,710.65 in incentive payments in addition to the $23,745.75 she had allowed in her September 4, 1984, final decision. In her June 3, 1985, final decision, the contracting officer recounted the circumstances that led to the termination as follows:

The termination for convenience of Salsbury's contract was made in good faith

pursuant to the order of the District Court for the District of Columbia that the Postal Service "suspend the performance of so much of the contracts awarded pursuant to Solicitation No. 104230–82–B–0068 as would have been awarded to plaintiff in January 1983 had plaintiff's offer been accepted in full and award an aluminum door lockbox contract to plaintiff in accordance with that order. . . ." Under the circumstances, a complete termination of all outstanding lockbox contracts was the best way to comply with the Court's order.

Salsbury filed the present action on August 22, 1985. The complaint alleges that defendant's termination of the contract constituted a breach of contract rather than a proper termination for convenience because the termination was the direct result of the Postal Service's "illegal, bad faith treatment of Doninger, and not the result of any misconduct by Salsbury." The complaint contains two causes of action that correspond to the portions of plaintiff's two certified claims which were denied by the contracting officer. In the first cause of action, plaintiff seeks $87,182 in incentive payments allegedly due under the contract for lockboxes delivered subsequent to the Postal Service's January 27, 1984, termination of the contract. (The $87,182 sum represents the $88,893.34 denied in the contracting officer's final decision of September 4, 1984, less the $1,710.65 in delivery incentives subsequently awarded by the contracting officer on June 3, 1985.) In the second cause of action, plaintiff seeks $630,767 to cover incentive payments that allegedly would have been earned had the contract not been terminated and had Salsbury produced and delivered early all of the remaining lockboxes called for in the contract.

### Discussion
#### The First Cause of Action

Defendant seeks summary judgment on plaintiff's first cause of action on two independent grounds. First, defendant contends that the claim is encompassed within the general release contained in the December 7, 1984, settlement agreement and, therefore, is barred under the doctrine of accord and satisfaction. Second, defendant contends that, in any event, the termination for convenience was valid and the contract did not provide incentive payments for lockboxes delivered after a termination for convenience.

In response, plaintiff first contends that the settlement agreement did not encompass the first claim and, hence, there was no accord and satisfaction. Second, plaintiff acknowledges that the early delivery incentives in the contract did not apply to deliveries made after a proper termination for convenience. Plaintiff contends, however, that it is entitled to summary judgment because the termination for convenience herein was not valid.

#### A. Accord and Satisfaction

Plaintiff contends that the release in the December 7, 1984, settlement agreement does not constitute an accord and satisfaction barring plaintiff's first claim because the release covers only "termination claims" and plaintiff's claim for $87,182 in delivery incentives for lockboxes built prior to termination is properly characterized as a "pretermination claim."

When interpreting a contract, the court ordinarily focuses on the plain meaning of the contract language. *S. W. Aircraft, Inc. v. United States*, 213 Ct.Cl. 206, 212, 551 F.2d 1208, 1212 (1977). It is incumbent upon a contractor that intends to reserve a claim in a settlement agreement to manifest its intention to do so "in a clearly recognizable manner." *Urbanizadora Santa Clara, S.A. v. United States*, 207 Ct.Cl. 297, 305, 518 F.2d 574, 578 (1975).

The release contained in the settlement agreement herein, on its face, is not limited to so-called "termination claims," but extends to "all other claims and liabilities of the contractor" not specifically reserved. The contract modification incorporating the settlement agreement into the contract uses similar broad language providing that Salsbury release the Postal Service from all unreserved claims "arising under the contract prior to execution of the agree-

ment." [3] The release, therefore, is sufficiently broad to encompass within its plain meaning plaintiff's claim for $87,182.

But a conclusion that the plain meaning of a release would bar a claim is not necessarily the end of the legal analysis. The issue of possible contract reformation remains. A party to a settlement agreement generally would be entitled to have the agreement reformed if the agreement does not accurately reflect the intent of the parties at the time of drafting. *American Employers Ins. Co. v. United States*, 812 F.2d 700, 705 (Fed.Cir.1987); *Olson Plumbing & Heating Co. v. United States*, 221 Ct.Cl. 197, 210, 602 F.2d 950, 958 (1979). *See also J.G. Watts Constr. Co. v. United States*, 161 Ct.Cl. 801, 806 (1963). Here, plaintiff argues that if its claim is deemed literally within the scope of the release, reformation of the settlement agreement is warranted because neither party intended the release to encompass plaintiff's $87,182 claim.

To support reformation, plaintiff contends that the parties "intentionally excluded" the claim for "pretermination" delivery incentives during the settlement agreement negotiations. Plaintiff argues that the negotiations were intentionally limited to matters within the authority of the termination contracting officer, Mr. Leonard Venturelli, who negotiated the settlement, and did not extend to matters such as the $87,182 "pretermination claim," which previously had been invoiced to and was the exclusive responsibility of the procurement contracting officer, Ms. Sarah Smith.

Salsbury's position is generally supported by the deposition testimony of its own officers and employees. However, the testimony of the relevant Postal Service employees is somewhat more ambiguous,[4] and the broad wording of the release, which was signed only three months after the contracting officer denied Salsbury's claim for $87,182, supports defendant's position that it intended the release to encompass that claim.

Summary judgment is appropriate only where there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 2509, 91 L.Ed.2d 202 (1986); *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1390 (Fed.Cir.1987). The moving party bears the burden of demonstrating the absence of any genuine issue of material fact, *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed. 2d 265 (1986), and all significant doubt over factual issues is to be resolved in favor of the nonmoving party. *Mingus Constructors*, 812 F.2d at 1390; *SRI Int'l v. Matsushita Elec. Corp.*, 775 F.2d 1107, 1116 (Fed. Cir.1985).

■ Here, the claim for $87,182 is within the literal scope of the settlement agreement release. But under the binding precedent cited above, if neither party intended the release to encompass the $87,182 claim, the terms of the contract could be reformed so as not to bar that claim. The evidence presented to date as to the parties' intent when they executed the settlement agreement is in conflict and results

---

**3.** The contract modification provides:

[T]he contractor agrees to remise, release and discharge the Postal Service, its employees, agents and assignees from any and all claims, liabilities, obligations and demands, asserted or not asserted, arising under the contract prior to execution of this agreement, excepting those items stipulated and reserved from this Settlement Agreement.

**4.** The testimony of the Postal Service employees related generally to the split in authority between the procurement contracting officer and the termination contracting officer. Mr. Venturelli and his subordinate testified that their individual responsibilities with respect to the Salsbury contract were distinct from the responsi-

bilities of the procurement contracting officer, and that the settlement agreement was negotiated in light of that split in responsibility. Moreover, Mr. Venturelli testified that the contract modification of January 2, 1985, did not address any items that were invoiced to the procurement contracting officer. But the Postal Service employees were not asked any direct questions about the terms of the release and the intent of the Postal Service when it included that release in the settlement agreement and subsequent contract modification. No postal official specifically testified that the release was not intended by the Postal Service to be given its plain meaning.

in a genuine issue of material fact. Summary judgment, therefore, is not appropriate with respect to defendant's affirmative defense of accord and satisfaction.

### B. *The Unavailability of Delivery Incentives for Deliveries Made After a Valid Termination for Convenience*

There is no dispute that the financial incentives for accelerated performance available to plaintiff under the contract relate exclusively to accelerated deliveries that occur prior to termination of the contract. The contract does not contain any financial incentive covering accelerated lockbox production (as distinct from accelerated delivery) or any incentive covering lockbox delivery that occurs subsequent to a termination for convenience.[5] Plaintiff's argument that it is entitled to $87,182 to cover deliveries made after the notice of termination for convenience, therefore, rests squarely on its contention that the termination for convenience was invalid. That contention is reviewed at length in the following discussion of plaintiff's second cause of action. Because this court concludes therein that there are no material issues of fact in dispute and that the termination for convenience was valid, defendant is entitled to summary judgment on this first cause of action.

### The Second Cause of Action

Plaintiff's second cause of action seeks $630,767 in incentive payments for lockboxes it expected to earn had the contract not been terminated. It is well established that such anticipatory profits would not be available if the contract was properly terminated for convenience. *See, e.g., G.C.*

*Casebolt Co. v. United States*, 190 Ct.Cl. 783, 788, 421 F.2d 710, 713 (1970); *General Builders Supply Co. v. United States*, 187 Ct.Cl. 477, 485–86, 409 F.2d 246, 251 (1969); *Nolan Bros., Inc. v. United States*, 186 Ct.Cl. 602, 607–08, 405 F.2d 1250, 1253–55 (1969).

Plaintiff attacks the validity of the termination on a number of grounds. Plaintiff contends that the contracting officer never made a determination that termination of the contract was in the best interest of the Postal Service, and even if she did, the termination was invalid for numerous reasons, including that it did not satisfy the legal requirements for a termination for convenience articulated in *Torncello v. United States*, 231 Ct.Cl. 20, 681 F.2d 756 (1982).

### A. *The Contracting Officer's Assessment of the Best Interest of the Postal Service*

As set forth above, the contract provided that the Postal Service may terminate the contract "whenever the contracting officer shall determine that such termination is in the best interest of the Postal Service." Internal Postal Service Regulation 8–202.1 provides that "responsibility for and authority to terminate contracts is vested in the procuring contracting officer," and that contracts shall be terminated when such action is "in the best interest of the Postal Service."

The communications sent by the contracting officer to plaintiff indicate that the contracting officer, faced with the district court's decision in *Doninger*, intended to, and did, terminate the contract pursuant to the termination for convenience clause.

---

5. Section H, subsection 13, of the contract, entitled "Delivery Incentive," provides:

The delivery quantities for each 30 day period are set out in the schedule in Section D. The Postal Service will encourage *accelerated deliveries* pursuant to this provision. The contractor will be paid a 10% premium over the unit price for each unit *delivered* in excess of the required quantity for any delivery period. Such quantities shall be prepared for shipment in sets pursuant to the delivery orders on hand or, if no delivery orders are on hand, in sets of equal quantities of all items (2901,

2902, etc.). Shipment of additional quantities during a delivery period will not reduce the quantity to be delivered in any succeeding delivery period until the total quantity required by the contract has been delivered. (Emphasis added.) Section D, subsection 6, of the contract, entitled *"Delivery* and Performance" (emphasis added), provides, in pertinent part:

Note: Incentives will be granted only with respect to *shipments* of complete units ... as specified in the individual delivery order. (Emphasis added.)

The stop-work order was issued "to implement the order" of the district court in *Doninger;* the subsequent letter and notification of termination indicated that termination was "for the convenience of the Postal Service." The contracting officer's final decision of June 3, 1985, recounted that "[u]nder the circumstances, a complete termination of all outstanding lockbox contracts was the best way to comply with the [*Doninger*] Court's order."

Plaintiff contends that these communications and actions notwithstanding, the contracting officer never made the required determination that termination was in the best interest of the Postal Service. Plaintiff relies in large part on the following excerpt of the deposition testimony of the contracting officer.

Q. Was the termination of Salsbury's contract in the best interest of the Postal Service?

A. In my opinion?

Q. Yes.

A. I would say no.

Q. Why not?

A. Because once you have a contractor that is actually performing, it is not in the best interest to terminate them. It costs you almost as much to terminate as it would to continue on.

Q. You didn't make a finding then that the termination was in the Postal Service's best interests?

A. To terminate?

Q. Yes.

A. No. We only went by the decision.

When viewed in isolation, this extract of testimony is ambiguous and potentially aids plaintiff. But when the court placed this testimony in the context of the remainder of the contracting officer's deposition testimony and the other undisputed evidence accompanying the cross-motions for summary judgment, the ambiguity seemed to disappear. It appeared that when the contracting officer stated "[n]o. We only

went by the decision," she merely indicated that if not for the district court's decision in *Doninger*, she would not have viewed termination as appropriate, but that in the context of the *Doninger* decision, termination was deemed in the best interest of the Postal Service.

However, to assure that both parties had ample opportunity to clarify any possible ambiguity on this issue, the court permitted the reopening of the contracting officer's deposition. In her additional testimony, the contracting officer indicated that in the portion of her testimony quoted above, she was indicating that "in [her] opinion ... [she] would not have terminated if it wasn't for the Court's decision." She testified to the effect that she disagreed with the *Doninger* decision, that had it not been for that decision she would not have terminated the Salsbury contract, that she viewed the decision as requiring her to terminate, and, therefore, that in the context of the *Doninger* decision, it was in the best interest of the government to terminate the Salsbury contract.[6]

Plaintiff contends that notwithstanding this additional testimony, for a number of reasons, the contracting officer should not be deemed to have made a valid determination that termination was in the best interest of the Postal Service. First, plaintiff contends that the contracting officer's testimony is evasive and inconsistent with other evidence, including her prior statement quoted in the text above. In view of the alleged inconsistencies, plaintiff contends that the contracting officer's credibility is in issue and summary judgment is therefore inappropriate.

However, after a careful review of her entire testimony and the other evidence of record, the court views Ms. Smith's testimony, in crucial part, as direct, forthcoming, internally consistent, and consistent with the other evidence of record. The evidence of record indicates that Ms. Smith

---

6. *Inter alia,* the contracting officer testified as follows:

Q. Okay. With respect to the Doninger decision that we have previously discussed, what do you believe concerning the best interest of

the Government as far as terminating Salsbury's contract?

A. As far as the Government, the best interest based on the Court decision, we had to terminate.

disagreed with the district court's decision, but as a result of the decision, she considered termination of plaintiff's contract to be in the Postal Service's best interest. In its citations to the evidence of record, including Ms. Smith's initial deposition testimony, plaintiff has not demonstrated any genuine issue as to Ms. Smith's credibility that would warrant denial of summary judgment. *See Liberty Lobby,* 477 U.S. at 250–52, 106 S.Ct. at 2511–12; *Sweats Fashions, Inc. v. Pannill Knitting Co.,* 833 F.2d 1560, 1562–63 (Fed.Cir.1987) (describing generally the burden on the nonmoving party in response to a properly supported motion for summary judgment).

Second, plaintiff contends that the district court only ordered that the Postal Service "suspend" the other contracts and did not use the word "terminate," and, therefore, the contracting officer was incorrect in her conclusion (which apparently was shared by the Law Department of the Postal Service) that the district court's decision required termination. But it is not apparent from the district court's order that the court intended the suspension only to be temporary.

The district court's order makes clear that the court intended the Postal Service to award Doninger a contract for a quantity of lockboxes commensurate with the quantity Doninger would have been awarded had its previous bid been accepted. It also is clear that existing contracts covered the entirety of the Postal Service's lockbox requirements pursuant to the May 20, 1982, solicitation. In this context, the court had the option of limiting its order simply to obliging the Postal Service to grant the required contract to Doninger. However, the court chose instead to order the Postal Service, in addition, to "suspend the performance of so much of the [five lockbox] contracts ... as would have been awarded to [Doninger] in January 1983 had [Doninger's] offer been accepted in full and award an aluminum lockbox contract to [Doninger] in accordance with that offer." Clearly, the court used the term "suspend" and not "terminate." But, if the court intended only a temporary suspension, it is not apparent why the court ordered any suspen-

sion at all, because a suspension of existing contracts was not necessary if the court intended only to assure that Doninger receive a contract award covering the number of lockboxes it would have received had it not been disqualified.

■ In any event, even assuming the contracting officer had misinterpreted the requirements of the court's order, such a good faith error would not itself result in a breach of contract. In *John Reiner & Co. v. United States,* 163 Ct.Cl. 381, 390, 325 F.2d 438, 442 (1963), *cert. denied,* 377 U.S. 931, 84 S.Ct. 1332, 12 L.Ed.2d 295 (1964), the Court of Claims described the broad discretion permitted a contracting officer in terminating a contract under the government's standard termination for convenience clause. The court stated:

[A] termination is authorized "whenever the contracting officer shall determine" that it is "in the best interests of the Government." The broad reach of that phrase comprehends termination in a host of variable and unspecified situations calling (in the contracting officer's view) for the ending of the agreement; the article is not restricted, as plaintiff contends, to a decrease in the need for the item purchased. Under such an all-inclusive clause, the Government has the right to terminate "at will" (*Davis Sewing Mach. Co. v. United States,* 60 Ct.Cl. 201, 217 (1925), *aff'd,* 273 U.S. 324 [47 S.Ct. 352, 71 L.Ed. 662] (1927); *Librach v. United States,* 147 Ct.Cl. 605, 611 (1959)), and in the absence of bad faith or clear abuse of discretion the contracting officer's election to terminate is conclusive. *See Line Constr. Co. v. United States,* 109 Ct.Cl. 154, 187 (1947).

*Id.*

Based on the undisputed facts summarized above, the contracting officer's decision to respond to the district court's order by terminating plaintiff's contract for convenience did not constitute a clear abuse of discretion.

■ Next, plaintiff contends, in effect, that the termination was invalid because it ultimately turned out to be adverse to the

financial best interest of the Postal Service. But the contracting officer need not prove ultimately correct in its determination that termination is in the best interest of the government. Rather, it is sufficient under *Reiner* to show the "absence of bad faith or clear abuse of discretion" in the contracting officer's assessment of the government's interest at the time of termination. *Id.* Herein, the Postal Service did not need the additional lockboxes it was obliged to purchase from Doninger, and a Postal Service official concluded that the Postal Service could not reach a satisfactory settlement with Doninger. In this setting, the decision to terminate the contract for convenience did not constitute either bad faith or a clear abuse of discretion even if it turned out that a different approach ultimately may have turned out to be preferable financially.

■ Next, plaintiff contends that the termination was invalid because the contracting officer did not personally consider certain options to terminating plaintiff's contract for convenience, including the options of seeking reconsideration or clarification of the district court's decision, appealing the decision, or negotiating a settlement with Doninger. But these litigation and strategy-related options were assessed by other officials in the Postal Service and it was not inconsistent with either the contract or the internal Postal Service regulations for the contracting officer to defer to those officials on such issues when making her assessment of the best interest of the Postal Service.

Finally, it is not significant that the contracting officer believed the district court's decision was wrong. In *Reiner*, the court concluded that a termination for convenience would be valid if it were made in deference to a decision by the Comptroller General that the contract should be cancelled, even when the contracting officer disagreed with the Comptroller's decision. 163 Ct.Cl. at 390, 325 F.2d at 442–43. The court indicated that it would be consistent with the best interest of the contracting agency to "minimiz[e] a conflict with another arm of Government properly concerned

with the contractual problem." *Id.* Certainly then it must be consistent with the agency's interest to comply with the perceived scope of a legally binding district court order.

B. *Evaluation of the Lawfulness of the Termination for Convenience Under Torncello*

Plaintiff contends that even if the contracting officer had made an otherwise proper determination that termination was in the best interest of the Postal Service, the termination nevertheless would be invalid because it conflicts in two ways with the standards enunciated in *Torncello*, 231 Ct.Cl. 20, 681 F.2d 756. First, plaintiff interprets *Torncello* as providing that termination for convenience is not available if the act that forms the alleged basis for the termination could be said to be reasonably foreseeable at the time of the contract, and, here, plaintiff contends, the decision by the district court in *Doninger* was reasonably foreseeable. Alternatively, plaintiff contends that termination for convenience is not available under *Torncello* when termination is the result of any bad faith actions by the government, and, here, the *Doninger* decision, which precipitated the termination, was the product of bad faith actions by the Postal Service against Doninger. A close analysis reveals, however, that *Torncello* does not articulate either of the two standards proposed by plaintiff.

The *Torncello* Decision

*Torncello* involved a contract in which the Navy, *inter alia*, agreed to pay $500 per call to Soledad Enterprises, Inc. (Soledad) for all of the Navy's pest control requirements at six Navy family housing projects. Soledad sued for breach of contract when, instead of using Soledad, the Navy secured pest control services from the Navy's Public Works Department at prices significantly lower than the Soledad contract price. 231 Ct.Cl. at 22–23, 681 F.2d at 758. Invoking the doctrine of constructive termination, the Navy defended the action on the grounds that the Navy properly could have terminated the con-

tract for convenience prior to its use of the Public Works Department for pest control services at the housing projects.[7] *Id.* at 21, 681 F.2d at 757.

The Court of Claims, however, disagreed. Based on its interpretation of two distinct principles of contract law, the court concluded that the Navy could not properly have terminated for convenience at the time it decided to use the services of the Public Works Department. *Id.* The first principle of contract law invoked was that consideration is required for a binding contract. The court concluded that "a party may not reserve to itself a method of unlimited exculpation [from the contract] without rendering its promises illusory and the contract void." *Id.* at 26, 681 F.2d at 760. Applying this principle, the court concluded that the Soledad contract would be void for lack of consideration if it were interpreted to permit termination for convenience at the time the Navy decided to give the pest control work to the Public Works Department. The court explained that "the government's promise to turn to Soledad for all of its pest control work, if it was also implicit in the termination for convenience clause that the government could give Soledad none, was no promise at all. The contract would thus fail." *Id.* at 42, 681 F.2d at 769.

The second principle of contract law invoked by the *Torncello* court was that parties to a contract are assumed to intend to enter into a binding contract. *Id.* at 27, 681 F.2d at 761. Therefore, if two interpretations of a contract are possible, one rendering the contract enforceable and the other void, the contract should be interpreted so as to render it enforceable.

Applying this principle, the court concluded that a somewhat restrictive interpretation of the right of the government to terminate for convenience under the contract would result in adequate consideration and thus an enforceable contract. The court indicated that "it is plain that parties to a contract may freely agree to various forms of risk allocation." *Id.* at 32, 681 F.2d at 764. Therefore, the court reasoned, there would be adequate consideration for the termination for convenience clause if the clause were interpreted to allocate risk in that the government could terminate for convenience when there were significant changes in "the circumstances of the bargain or in the expectations of the parties." *Id.* at 48, 681 F.2d at 772. The court, however, found no significant change in the expectations of the parties in *Torncello* because the Navy had known at the time it entered the contract with Soledad that it could get pest control services more cheaply elsewhere. *Id.*

Thus, in *Torncello*, the Court of Claims limited the government's use of the termination for convenience clause because on the facts of that case the court concluded

---

7. The doctrine of constructive termination for convenience permits the government, in certain circumstances, to rely upon the termination for convenience clause in a contract to avoid liability for breach of contract even though the government never actually terminated the contract pursuant to the termination for convenience clause. The scope and origin of the doctrine are explained in *G.C. Casebolt,* 190 Ct.Cl. at 786–87, 421 F.2d at 712, as follows:

The rule we have followed is that, where the contract embodies a convenience-termination provision ... a Government directive to end performance of the work will not be considered a breach but rather a convenience termination—if it could lawfully come under that clause—even though the contracting officer wrongly calls it a cancellation, mistakenly deems the contract illegal, or erroneously thinks that he can terminate the work on some other ground. *John Reiner & Co. v. United States,* 163 Ct.Cl. 381, 325 F.2d 438

(1963), *cert. denied,* 377 U.S. 931 [84 S.Ct. 1332, 12 L.Ed.2d 295] (1964); *Brown & Son Elec. Co. v. United States,* 163 Ct.Cl. 465, 325 F.2d 446 (1963); *Nesbitt v. United States,* 170 Ct.Cl. 666, 345 F.2d 583 (1965), *cert. denied,* 383 U.S. 926 [86 S.Ct. 931, 15 L.Ed.2d 846] (1966); *Coastal Cargo Co. v. United States,* 173 Ct.Cl. 259, 351 F.2d 1004 (1965); *Warren Bros. Roads Co. v. United States,* 173 Ct.Cl. 714, 355 F.2d 612 (1965); *Schlesinger v. United States,* 182 Ct.Cl. 571, 390 F.2d 702 (1968). The principle underlying these decisions is that a party to a contract may 'justify an asserted termination, rescission, or repudiation, of a contract [which turns out not to be well grounded] by proving that there was, at the time, an adequate cause, although it did not become known to him until later.' *College Point Boat Corp. v. United States,* 267 U.S. 12, 16 [45 S.Ct. 199, 201, 69 L.Ed. 490] (1925).

(Footnotes omitted.)

that, absent such a limitation, the particular contract involved would be void for lack of any government consideration. The case at bar can be factually distinguished from *Torncello* in ways that would appear to show the presence of contract consideration by the government without resort to an interpretation of the termination for convenience clause that is narrower than its plain meaning.[8] *See id.* But it is not necessary to rely upon any of these factual distinctions because, as explained below, even assuming that the only possible source of government consideration in the Salsbury contract is through the narrow interpretation of the termination for convenience clause employed in *Torncello*, plaintiff could not prevail under that interpretation.

### *Torncello* Does Not Apply a Reasonable Foreseeability Test

Plaintiff contends that the Postal Service's misconduct in the procurement process was necessarily known to the Postal Service prior to the execution of the contract with Salsbury because Doninger was improperly excluded from the procurement process prior to that event. Therefore, plaintiff contends, the district court's order in *Doninger* was "reasonably foreseeable" to the Postal Service at the time it entered the Salsbury contract and the Postal Service could not, consistent with *Torncello*, terminate that contract in response to such a reasonably foreseeable event.[9]

This argument misreads *Torncello*. The *Torncello* analysis does not involve an assessment of whether the acts that precipitated the termination were "reasonably foreseeable." As explained above, *Torncello* is not based on equitable notions concerning treatment of government contractors, but rather on specific, articulated principles of contract law. The court concluded that "a power to terminate must be limited in some meaningful way, as measured by the requirement of consideration," *id.* at 48, 681 F.2d at 772, and that, in the absence of something else to furnish consideration, consideration would exist if the termination for convenience clause were interpreted to allocate to the contractor the risk that there would be "some kind of change from the circumstances of the bargain or in the expectations of the parties." *Id.*

Reasonable foreseeability is a very different concept than the actual expectations of the parties. A wide and disparate spectrum of events could, based on an objective analysis, be deemed "reasonably foreseeable" to the parties when they entered the contract even though, in fact, the events were not in any way expected by the parties. *See, e.g.,* 5 Corbin, Corbin on Contracts ¶ 1009 (1963) ("reason to foresee is not actual foresight"). But *Torncello* only requires that the events that provoke the government's conclusion that termination is in its best interest be unexpected, *i.e.,* inconsistent with the assumptions of the parties when they entered the contract. It does not require that the events also not be reasonably foreseeable to the parties. *See Nationwide Roofing and Sheet Metal Co. v. United States,* 14 Cl.Ct. 733, 736 (1988) (refusing to interpret *Torncello* as prohibiting termination where the government

---

**8.** For example, in *Torncello,* the contractor did not perform any duties and the government did not make any payments under the contract. In this action, however, there was significant performance under the contract by both parties; Salsbury delivered substantial goods and the Postal Service made substantial payments, including payments pursuant to the government's obligations under the termination for convenience clause. It cannot be disputed that after Salsbury commenced performance the Postal Service was bound under the contract to make certain payments, even if it later chose to terminate the contract for convenience. Another distinction is that in this action, the Postal Service terminated for convenience pursuant to the terms of the contract which required the government to give notice of any termination for convenience. In *Torncello,* the termination for convenience occurred without notice pursuant to the doctrine of constructive termination. (*But see Torncello,* 231 Ct.Cl. at 44 n. 10, 681 F.2d at 770, where the court indicates that a requirement of notice before termination may not be sufficient to constitute consideration.)

**9.** Defendant disputes that the *Doninger* decision was "reasonably foreseeable." However, it is not necessary to evaluate the parties' respective claims as to foreseeability since, as explained *infra,* this court concludes that "reasonable foreseeability" is not the controlling standard.

"should have known" of the act that precipitated termination at the time of entry into the contract).

Herein, there can be no dispute that the *Doninger* decision, which was the cause of the termination, was not expected by the parties at the time of the contract. At that time, the contracting officer had excluded Doninger from the bidding and the Postal Service was entering contracts with the five successful bidders to supply all of the Postal Service's lockbox requirements. The *Doninger* decision, unexpectedly, obliged the contracting officer to enter a contract with Doninger for a substantial number of additional lockboxes. A basic assumption that the Postal Service had relied upon when it entered the contract with plaintiff was that it needed all of the lockboxes Salsbury had agreed to produce. The effect of the *Doninger* decision, therefore, was to eliminate that previously assumed need. As a result, the Postal Service would no longer secure from continuation of the Salsbury contract the full benefits it had expected to secure when it entered the contract. Termination for convenience in the context of this unexpected event is fully consistent with the analysis of *Torncello*.

*Torncello and Bad Faith Decisions to Terminate*

Plaintiff relies primarily on *Torncello* to support its contention that termination for convenience is not permissible here because the termination stems from bad faith actions by the government against Doninger. The discussion of bad faith in *Torncello* is brief and focuses exclusively on the contracting officer's intent when terminating the contract for convenience. In *Torncello*, the Navy knew at the time it entered the contract with Soledad that the pest control services were available elsewhere at a cheaper price, and the *Torncello* court stated that "the government cannot invoke the [termination for convenience] clause where ... the contracting officer lacks good faith in the determination of interest." 231 Ct.Cl. at 44–45, 681 F.2d at 770.

But here, plaintiff does not allege that the contracting officer lacked good faith when she evaluated the Postal Service's interest and terminated plaintiff's contract. Indeed, plaintiff apparently does not allege that the contracting officer, at any time, undertook any action in bad faith against plaintiff. Rather, plaintiff contends merely that the termination was the ultimate result of previous bad faith actions by the Postal Service against Doninger.

Plaintiff has not cited any case in which the government has been prevented from terminating a contract for convenience solely because it had previously dealt in bad faith with a third party that was not a party to the contract in issue. Moreover, such an extension of the law would appear clearly unwarranted here. The Postal Service entered into a contract with Salsbury that included a termination for convenience clause which gave the Postal Service certain rights. Since the Postal Service cannot be said to have breached any obligation it owed directly to plaintiff under the contract, the government should not be prevented from exercising its rights under the contract's termination for convenience clause. *See, e.g., McFadden, Inc. v. United States*, 215 Ct.Cl. 918, 921–22 (1977) ("[i]n the absence of malicious intent or animus *toward the plaintiff* on the part of the government officials, the plaintiff is entitled only to the compensation provided under the termination-for-convenience clause") (emphasis added). *See also, Kalvar Corp. v. United States*, 211 Ct.Cl. 192, 198–99, 543 F.2d 1298, 1302 (1976), *cert. denied*, 434 U.S. 830 (1977); *Descon System, Ltd. v. United States*, 6 Cl.Ct. 410, 413 (1984).[10]

10. Indeed, rather than necessarily being harmed by the Postal Service's allegedly bad faith disqualification of Doninger, plaintiff may potentially have benefited. Doninger's disqualification apparently made profitable contracts available to bidders such as Salsbury who otherwise may not have received an equivalent contract. Moreover, while it is possible that Salsbury may not have been harmed by the disqualification of Doninger, it cannot be disputed that the Postal Service was harmed. Plaintiff acknowledges that the ultimate result of excluding Doninger as

### Conclusion

In sum, defendant's cross-motion for summary judgment is sufficient to demonstrate the absence of any dispute as to a material fact and that defendant is entitled to judgment as a matter of law. Plaintiff has not presented evidence sufficient to demonstrate the existence of a genuine dispute as to a material fact. Therefore, plaintiff's motion for summary judgment is denied, and defendant's cross-motion is granted. The Clerk of the Court shall dismiss the complaint. No costs.

IT IS SO ORDERED.

a bidder was that the Postal Service was forced to pay millions of dollars more for the lockboxes than it would have had to pay had it not disqualified Doninger. Lessons that costly tend to be learned and should produce a strong deterrent against any similar disqualifications by the Postal Service in the future.