905 F.2d 1518
 36 Cont.Cas.Fed. (CCH) 75,875
 SALSBURY INDUSTRIES, Plaintiff-Appellant,
v.
The UNITED STATES, Defendant-Appellee.
 No. 89-1592.
 United States Court of Appeals,
Federal Circuit.
 June 13, 1990.
Rehearing Denied July 6, 1990.
Suggestion for Rehearing In Banc
Declined July 27, 1990.
 
 Eugene R. Fidell, Feldesman, Tucker, Leifer, Fidell & Bank, Washington, D.C., argued, for plaintiff-appellant. With him on the brief, was Edward S. Wactlar, Blau, Kramer, Wactlar & Lieberman, P.C., Jericho, N.Y., of counsel.
 Agnes M. Brown, Commercial Litigation Branch, Dept. of Justice, Washington, D.C., argued, for defendant-appellee. With her on the brief, were Stewart E. Schiffer, Asst. Atty. Gen., David M. Cohen, Director and Thomas W. Petersen, Asst. Director. Also on the brief, was Mark E. Dennett, Postal Service Counsel, U.S. Postal Service, Washington, D.C., of counsel.
 Before MARKEY, Chief Judge, MAYER, Circuit Judge, and DUFF, District Judge.*
 OPINION
 MAYER, Circuit Judge.
 
 
 1
 Salsbury Industries appeals the judgment of the United States Claims Court, 17 Cl.Ct. 47 (1989), sustaining the convenience termination of Salsbury's contract with the United States Postal Service and denying Salsbury certain incentive payments. We affirm.
 
 Background
 
 2
 The Postal Service solicited bids for the manufacture and installation of aluminum post office lockboxes, and Salsbury and four other bidders were awarded contracts. Salsbury's contract required delivery of 2900 lockboxes for $9.7 million, and provided for an additional ten percent incentive payment for lockboxes delivered ahead of the specified delivery schedule. Prior to termination of its contract, Salsbury had delivered almost half of the lockboxes called for in the contract and was paid about $4.6 million, including over $260,000 in incentive payments.
 
 
 3
 Another bidder, Doninger Metal Products Corporation, had been disqualified because the contracting officer said it was not a responsible offeror. Doninger brought suit in the United States District Court for the District of Columbia challenging the nonresponsibility determination and asking for an injunction requiring the Postal Service to terminate all contracts awarded under the solicitation and either award a contract to Doninger or resolicit bids. The Postal Service notified Salsbury of Doninger's suit, but Salsbury did not seek to intervene. The district court ruled that Doninger had been unlawfully prevented from receiving a contract and ordered the Postal Service to "suspend the performance of so much of the contracts awarded pursuant to [the] [s]olicition ... as would have been awarded to [Doninger] ... had [Doninger's] offer been accepted in full and award an aluminum door lockbox contract to [Doninger] in accordance with that offer." Doninger Metal Products Corp. v. United States Postal Service, No. 83-2725 (D.D.C. Jan. 9, 1984). The Postal Service did not pursue an appeal.
 
 
 4
 Following this injunction, the contracting officer sent Salsbury a stop work order "to implement the order of the ... district court." A couple weeks later, the contracting officer notified Salsbury that, effective immediately, its contract was "terminated for the convenience of the Postal Service pursuant to clause 8 of the General Provisions for Fixed Price Contracts." Clause 8 provides in part: "The performance of work under this contract may be terminated by the Postal Service in accordance with this clause in whole, or from time to time in part, whenever the Contracting Officer shall determine that such termination is in the best interest of the Postal Service." The Postal Service authorized Salsbury to deliver the lockboxes it had manufactured but not yet delivered prior to termination. Doninger was awarded a $15.7 million lockbox contract.
 
 
 5
 Salsbury submitted a claim to the contracting officer for $112,639 in delivery incentives allegedly earned prior to termination and was paid $25,457 on this claim. The contracting officer determined that the remaining $87,182 was for post-termination lockbox deliveries to which delivery incentives did not apply.
 
 
 6
 The parties entered into a settlement agreement under which the Postal Service paid Salsbury an additional $3.4 million in convenience termination costs, which included a profit. This settled all claims arising under the contract prior to the agreement except those specifically reserved. A claim for $630,767, the amount of delivery incentives that could have been earned on the remaining lockboxes due under the contract, was reserved. Salsbury submitted this claim to the contracting officer, and it was denied.
 
 
 7
 Salsbury then filed a complaint in the Claims Court, claiming $87,182 in incentive payments for lockboxes delivered subsequent to termination, and $630,767 in incentive payments it allegedly would have earned had the contract not been terminated. On cross-motions for summary judgment, the Claims Court held that the Postal Service was entitled to judgment as a matter of law on both claims.
 
 Discussion
 
 8
 Salsbury argues that termination for convenience was improper because the contracting officer never made the required determination that termination was in the best interest of the Postal Service. It relies primarily on the contracting officer's deposition testimony that she thought the Postal Service's interest would be best served by seeking to overturn the district court's Doninger decision. The Claims Court reviewed that testimony and concluded: "She testified to the effect that she disagreed with the Doninger decision, that had it not been for that decision she would not have terminated the Salsbury contract, that she viewed the decision as requiring her to terminate, and, therefore, that in the context of the Doninger decision, it was in the best interest of the government to terminate the Salsbury contract." 17 Cl.Ct. at 54 (emphasis added).
 
 
 9
 We agree. The contracting officer considered termination of Salsbury's contract to be in the best interest of the Postal Service in view of the district court order in Doninger. She may have disagreed with the Postal Service's decision not to pursue its appeal of Doninger, but it was beyond her authority to change it. The decision about an appeal was made by the Assistant Postmaster General for Procurement and Supply, in coordination with the Assistant General Counsel for the Procurement Division and attorneys at the Department of Justice.[1]
 
 
 10
 Salsbury points to nothing else in the record that suggests a material factual dispute about whether the contracting officer properly determined that termination was in the best interest of the Postal Service. Evidence cited by the Claims Court supports the conclusion that she made the determination. In the stop work order, the contracting officer wrote that "this action is taken to implement the order of the United States District Court for the District of Columbia in Doninger Metal Products Corporation vs. United States Postal Service." The telex and confirmation letter informing Salsbury that its contract was being terminated stated that the contract was terminated for the convenience of the Postal Service in accordance with clause 8 of the contract. Finally, in her final decision on Salsbury's claim for incentive payments on undelivered lockboxes, the contracting officer wrote: "The termination for convenience of Salsbury's contract was made in good faith pursuant to the order of the District Court.... Under the circumstances, a complete termination of all outstanding contracts was the best way to comply with the Court's order."
 
 
 11
 It is not the province of the courts to decide de novo whether termination was the best course. "In the absence of bad faith or clear abuse of discretion the contracting officer's election to terminate is conclusive." John Reiner & Co. v. United States, 163 Ct.Cl. 381, 325 F.2d 438, 442 (1963).
 
 
 12
 Salsbury's second argument is that, under Torncello v. United States, 231 Ct.Cl. 20, 681 F.2d 756 (1982), the termination of its contract was improper because it was the foreseeable victim of the Postal Service's illegal conduct. As Salsbury sees it, because the Postal Service knew of its misconduct in disqualifying Doninger before it awarded the contract to Salsbury, the Doninger injunction does not justify allocating the burden of changed circumstances to Salsbury.
 
 
 13
 Torncello has nothing to do with this case. It stands for the unremarkable proposition that when the government contracts with a party knowing full well that it will not honor the contract, it cannot avoid a breach claim by adverting to the convenience termination clause. In that case, the government entered into an exclusive requirements contract knowing that it could get the same services much cheaper from another outfit. When the contractor complained that the government was satisfying its requirements from the cheaper source and ordering nothing from it, in breach of the contract, the government said its actions amounted to a constructive termination for convenience. The court, not surprisingly, held that the government could not avoid the consequences of ignoring its promise to that contractor by hiding behind the convenience termination clause. If it could agree to buy services with no intention of doing so, the contract would fail for want of consideration. So the court enforced it as written.
 
 
 14
 In stark contrast, here the Postal Service entered into a definite quantity contract with every intention of honoring it. The Postal Service's malfeasance in disqualifying Doninger from the solicitation says nothing about its intentions toward its contract with Salsbury. In fact, the Postal Service did honor it for over a year to the tune of nearly $5 million before Doninger secured the injunction from the district court ordering the Postal Service to terminate the contracts with Salsbury and the other suppliers and to give Doninger what it would have received if its bid had been accepted. The court apparently felt certain that Doninger, as a successful awardee of similar contracts for 18 years, would have gotten at least a portion of this contract as well. Significantly, Salsbury was given the opportunity to intervene in the Doninger case, where it might well have been able to affect the terms of the injunction, but it chose not to participate.
 
 
 15
 Now Salsbury says the illegality of the Postal Service's actions against Doninger, not against itself, prohibits the termination of its contract, notwithstanding the district court's order to do just that. A convenience termination is authorized if the contracting officer deems it to be in the best interest of the Postal Service. It strikes us that few things would be more in the best interest of the Postal Service than to abide by the order of the district court, even if it thought the decision was wrong. GTE Sylvania, Inc. v. Consumers Union, 445 U.S. 375, 386, 100 S.Ct. 1194, 1201, 63 L.Ed.2d 467 (1980). The penalty for declining to do so could be profound; it could even include criminal contempt sanctions. United States v. United Mine Workers, 330 U.S. 258, 294, 67 S.Ct. 677, 696, 91 L.Ed. 884 (1947).
 
 
 16
 The Doninger injunction was a proper and sufficient basis for the termination of Salsbury's contract. This principle is well-recognized. Convenience terminations have been sustained when they were invoked to avoid conflict with other governmental entities. Schlesinger v. United States, 182 Ct.Cl. 571, 390 F.2d 702 (1968) (the Navy deferred to the views of a Senate subcommittee); John Reiner & Co., 325 F.2d 438 (compliance with a General Accounting Office ruling). If deference to the nonbinding views of those political bodies supports a convenience termination, it could hardly be otherwise when the contract is terminated because of an order of a United States district court.
 
 
 17
 Salsbury's foreseeability argument is also misplaced. It is undisputed that at the time the contract was awarded neither Salsbury nor the Postal Service expected an injunction ordering its termination. The Doninger decision was an unanticipated change in circumstances, not merely justifying but compelling termination of the contract.
 
 
 18
 Because there was a valid termination for convenience, Salsbury is not entitled to payment on either of its claims. The incentive clause of the contract did not provide for post-termination delivery incentives, thus disposing of the $87,182 claim. And it is well-settled that a contractor terminated for convenience is not entitled to anticipated profits. G.C. Casebolt Co. v. United States, 190 Ct.Cl. 783, 421 F.2d 710, 713 (1970). Therefore Salsbury is also not entitled to the $630,767 it seeks for delivery incentives it expected to earn had the contract not been terminated.
 
 Conclusion
 
 19
 Accordingly, the judgment of the Claims Court is affirmed.
 
 
 20
 AFFIRMED.
 
 
 21
 BRIAN BARNETT DUFF, District Judge, dissenting.
 
 
 22
 The government and its agencies enter into contracts as do private persons, and the common law governs them all. The " 'avowed purpose and primary function' " of a court when presented with a contractual dispute--including those involving the federal government--" 'is the ascertainment of the intention of the parties.' " Alvin Ltd. v. United States Postal Service, 816 F.2d 1562, 1564, 1565 (Fed.Cir.1987) (quoting S. Williston, A Treatise on the Law of Contracts Sec. 601 (3d ed. 1961)). See also Government Systems Advisors, Inc. v. United States, 847 F.2d 811, 813-14 (Fed.Cir.1988) (Markey, C.J.). I believe that the court loses sight of this function in this case. Throughout its opinion, the court characterizes the issue as whether the Postal Service's termination of its contract with Salsbury Industries was "improper." Whether the Postal Service acted properly or not is not for us to consider. Rather, the issue for this court is whether the Postal Service and Salsbury Industries intended to allow the Postal Service to terminate its contract with Salsbury with impunity under the circumstances presented here. The Postal Service argues that it had this right under the "Termination for Convenience" clause of its contract. I believe that the parties did not intend that the Postal Service could invoke this provision here, and for this reason I dissent from the court's judgment.
 
 
 23
 In most contractual disputes, a court begins with the plain language of the parties' contract. That is what the court does in this case. In fact, the court's analysis ends with the language of the contract, too: the court reads, "The performance of work under this contract may be terminated by the Postal Service ... in whole ... whenever the Contracting Officer shall determine that such termination is in the best interest of the Postal Service"; the court concludes that the contracting officer made such a determination in this case, and thus the court holds that the Postal Service acted properly.
 
 
 24
 By ending its analysis with the words of the parties' contract, the court fails to give full consideration to what the parties intended. Prior to this case, the court has never given the words of similar termination for convenience clauses their plain meaning, as the court below correctly observed. See 17 Cl.Ct. 47, 56-58 & n. 7 (1989). The termination for convenience clause emerged as a response to problems which the government faced as far back as 1876, and first appeared in defense contracts made during World War I. See Torncello v. United States, 231 Ct.Cl. 20, 681 F.2d 756, 764-65 (1982) (en banc) (Bennett, J., presenting history of clause). The modern clause carries a jurisprudence which shades its plain meaning. See id., 681 F.2d at 766 (courts do not apply the clause "as broadly as an untutored reading of words might suggest"); Maxima Corp. v. United States, 847 F.2d 1549, 1553 (Fed.Cir.1988) ("termination for convenience ... is not of unlimited availability to the government [nor] an open license to dishonor contractual obligations").
 
 
 25
 Companies should be able to rely upon prior interpretations of termination for convenience clauses when negotiating with the government, rather than insisting on having the government spell out settled law in its contracts. See S. Williston, supra, at Sec. 615. In any event, judicial interpretations of a contractual provision form part of the background against which parties make their contract. When parties incorporate terms which have settled meanings, it is incumbent upon the court to move beyond the plain language of those terms and look at judicial understandings of them. By doing this, the court gives effect to the parties' intent. This is as it should be, for it is the parties who have bargained, not the courts.
 
 
 26
 I believe that prior cases of this court and those of its predecessors indicate, at a minimum, that the government may not declare a termination for convenience merely to avoid risks known to the government at the time of contracting. Such was the holding of the majority of judges in Torncello. See 681 F.2d at 767-72 (Bennett, J., for plurality) (purpose of termination for convenience clause is to allow government to shift risk of unforeseen changes in circumstances to counter-party); id., 681 F.2d at 773 (Davis, J., concurring) (government may not invoke standard termination for convenience clause to excuse a circumstance which it recognized at the time of contracting). Legal observers have accepted Torncello as articulating at least this limit on the government's power to invoke termination for convenience clauses. See Note, Limiting the Government's Ability to Terminate For Its Convenience Following Torncello, 52 Geo.Wash.L.Rev. 892, 902 (1984) ("the majority and concurring opinions agree that any termination based on pre-contract knowledge fails for lack of consideration"). This court in Maxima, underscored this principle, albeit in dicta. See Maxima 847 F.2d at 1552.
 
 
 27
 The court now claims that Torncello stands for a much narrower proposition, that it limits the government's recourse to a termination for convenience clause only when the government knows "full well" it will not honor a contract. Torncello and Maxima lead me to believe that the judges in those cases struggled to attain a wider vision of the doctrine of termination for convenience. Pre-existing intent to breach a contract smacks of bad faith, a concept not central to the discussions in either Torncello or Maxima. If all that the Torncello court had to say was that the government should not enter into a contract in bad faith, then the majority of judges in that case expended too great an effort.
 
 
 28
 The court suggests further that this case stands "[i]n stark contrast" to Torncello, principally because the Postal Service intended to perform its contract with Salsbury and did not foresee the injunction which resulted from Doninger Metal Products's lawsuit. In light of what the Postal Service really foresaw at the time it contracted with Salsbury, the Postal Service's intentions were hardly so noble. In 1982, in the midst of Doninger and Salsbury's competition for the lockbox contracts which are at issue in this case, Postal Service inspectors learned of allegations that Postal Service employees had received kickbacks from Doninger on another contract. The Assistant Postmaster General responsible for procurement thus gave oral directions that the Postal Service was not to award Doninger any contracts until after the clouds lifted. The contracting officer who was supervising the bidding on the lockbox contract thereafter "determined" that Doninger was a "nonresponsible offeror," purportedly because of Doninger's inadequate performance under a prior contract. The contracting officer put her reasons in writing in late November 1982, but did not give them to Doninger.
 
 
 29
 With the field of bidders essentially smaller by one, the contracting officer awarded lockbox contracts to Salsbury and four other companies in January 1983. It was then that the Postal Service notified Doninger of its disqualification. Doninger protested unsuccessfully to Postal Service, then sued in federal court. After a hearing on the merits, the court determined that the Postal Service's "finding" of nonresponsibility amounted to a de facto suspension of Doninger, one made in violation of Postal Service regulations. The court thus ordered the Postal Service to suspend the performance of the January 1983 lockbox contracts. The Postal Service turned around and told Salsbury to stop work; the dispute over what the Postal Service owed Salsbury resulted in this case.
 
 
 30
 It is true, in a sense, that the Postal Service did not anticipate the Doninger court's injunction when it awarded the lockbox contract to Salsbury. Although the contracting officer intentionally had wronged Doninger, it was possible that Doninger--a company which had done business with the government since 1965--could have had a good cry about losing its contract, and walked away without protesting the injustice done to it. It was also conceivable that Doninger could have filed suit, but then lacked sufficient resources to pursue the matter to final judgment. It was further possible that, once it had discovered the contracting officer's wrongdoing, the Doninger court could have ordered a different remedy. Many things were possible, but what was foreseen? Having knowingly and improperly disqualified a company with Doninger's experience, the contracting officer had to have known that the Postal Service would get caught. In our society, wrongdoers usually have to make amends, so the contracting officer must have foreseen the risk that once the Postal Service was caught, any contract tainted by its misconduct would be in jeopardy. Nevertheless, the Postal Service disregarded this risk, and entered into a contract with Salsbury.
 
 
 31
 Having known of the risk of an injunction at the time it contracted with Salsbury, the Postal Service should not be able to use a termination for convenience clause to shift that risk to Salsbury now.* The court holds otherwise. Today, two wrongs make a right. Hereafter, if the government intentionally and unlawfully disqualifies someone when it awards a contract, one should not be surprised when the government forces an innocent recipient of that contract to bear part of the cost of the government's misconduct. Persons doing business with the government should take heed.
 
 
 
 *
 Judge Brian Barnett Duff of the United States District Court for the Northern District of Illinois, sitting by designation
 
 
 [1]
 The record contains a letter from the Assistant Postmaster General for Procurement and Supply, stating: "We will then consult with counsel, who are conferring in the meantime with the Assistant U.S. Attorney. Their preliminary view is that they will not recommend an appeal. I am inclined to agree. We will take whatever action is necessary, based on the advice of counsel, to comply with the court's order."
 
 
 *
 My belief that the Postal Service may not employ the termination for convenience clause in the fashion approved by the court should not indicate that I believe that Salsbury is entitled to all of the damages which it claims