**GOVERNMENT SYSTEMS ADVISORS, INC. and CPT Corporation, Inc., Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

Nos. 793–86C, 122–87C.

United States Claims Court.

Aug. 28, 1990.

Michael E. Geltner, Washington, D.C., for plaintiffs.

Cheryl S. Rome, Washington, D.C., with whom was Asst. Atty. Gen. Stuart M. Gerson, for defendant.

## ORDER

MOODY R. TIDWELL, III, Judge:

This case is before the court on cross-motions for partial summary judgment addressed to four claims, the determination of which is intended by the parties to guide them to settlement of numerous other similar claims. Defendant also moved to strike two affidavits offered by plaintiff in support of its claims. The case was originally assigned to Judge John L. Napier, who has since resigned from the bench. The case was transferred to these chambers. After completion of initial briefing, but prior to transfer, the United States Claims Court filed its opinion in *Pacificorp Capital, Inc. v. United States*, 15 Cl.Ct. 663 (1988). The parties, believing that *Pacificorp* might be helpful in addressing the issues in this case, requested, and were granted, an opportunity to supplement their earlier motions by a round of briefing on the impact of *Pacificorp*.[1] Oral argument followed.

## FACTS

The issues at bar arose from delivery orders initially placed by the United States Air Force for word processors from CPT Corporation, Inc. against FY 1984 and 1985 General Services Administration (GSA) Lease to Ownership Plan (LTOP) contracts. Government Systems Advisors, Inc. (GSAI) was CPT's funding source for the contracts.[2] A total of twentyone initial delivery orders were placed against CPT's FY 1984 and 1985 base LTOP contracts.

The LTOP was an agreement whereby defendant agreed to pay for word processing equipment for a specified period of time at a set monthly payment rate. At the end of the agreed period, ownership of the equipment would pass to defendant. The delivery orders issued against each fiscal year base LTOP contract gave defendant the right to purchase the equipment at any time during the term of the delivery order by payment of an amount to be determined

---

1. The court studied *Pacificorp* and the briefs and concluded that it had limited bearing on the outcome of this opinion because of significant factual differences.

2. CPT is the only party with a contractual relationship with the government that would permit it to bring suit under the Tucker Act, 28 U.S.C. § 1491, before this court. GSAI, which previously did business under the name Pacificorp Capital, Inc., and perhaps others, carried the lead oar however. CPT is obviously greatly interested in the outcome of the this litigation but GSAI, if anything, is even more interested. Over a period of years, GSAI and its predecessor(s) in interest have been seeking the elusive magical government contract language that would for most practicable purposes bind the United States to full completion of LTOP contracts.

by a buy-out formula included in the contract. According to plaintiff, all lease debt burden was eliminated from the buy-out formula; the buy-out price merely completed payment for the equipment as if purchased initially, including, we assume, a profit factor.

Government Systems Advisors, Inc. informed CPT that it would finance the delivery orders only if it were assured that defendant would maintain them to completion and not take earlier title to the equipment except through the buy-out formula. Its proposal to CPT envisaged payment for two to four years with the transfer of ownership to defendant at the end of the fixed period, unless funds were not available to renew the delivery orders. The GSA contracting officer could not accept the terms of the base LTOP contracts as proposed by GSAI/CPT but, instead, negotiated a "Statement of Intent" that was incorporated into the resulting FY 1983–1985 base LTOP contracts and delivery orders. The "Intent" clauses therein were succinct and clear. They provided in relevant part:

> It is understood by all parties to this contract that this is an ownership arrangement, that is[,] a lease to title contract. In that regard the Government, as lessee, contemplates fulfilling that agreement. Further, the Government intends not to terminate this contract prior to completion of its specified Aggregate Contract Term. This includes their intent not to terminate the contract for non-avalability [sic] of funds if funds are available during the Aggregate Contract Term to pay for functionally equivalent tasks for which CPT equipment have [sic] been acquired.

The caveat contained in the last sentence of the Intent clause was intended by the parties to mean that if funds were available for the acquisition of equipment from any other source to perform "functionally equivalent tasks," the CPT delivery orders would be considered constructively funded and defendant obligated to renew them for the following fiscal year. In FY 1986 the "Intent" clause was amended by deletion of the third and fourth sentences.

Each fiscal year base LTOP contract stated that the term of any delivery order against it was to run from the date of execution until the end of the first fiscal year.[3] Thereafter, the term would be for the full fiscal year and all following fiscal years through the aggregate terms of the delivery orders. Other pertinent terms of all of the CPT fiscal year base LTOP contracts were:

> Subject to the provisions of this Paragraph, the Government has the option to renew the CPT FLTOP [4] each fiscal year for an additional twelve (12) month Renewal Term for the equipment contracted under this Plan until completion of the Aggregate Contract Term specified in Paragraph 1.b.(1), at the prices set forth in the Price List, by giving written notice of renewal to CPT on the first of October of each fiscal year or as soon as practicable but not more than 45 days after the date the Government receives formal notification from its funding source that funds are available. The Contracting Officer for the Government shall provide written notice of Government's intention to renew at least sixty (60) days prior to the expiration of the Initial Term or any Renewal Term. Such notice of intention to renew shall not bind the Government. Actual renewal shall occur annually throughout the Aggregate Contract Term, subject to availability of funds.
>
> \* \* \* \* \* \*
>
> All orders shall remain in effect through the earlier of September 30 of the fiscal year or the Expiration Date of the CPT FLTOP, unless the Government exercises its right hereunder to acquire title to the machine prior to the Plan expiration date or to terminate the CPT FLTOP pursu-

---

**3.** A "delivery order" against the base LTOP contract was a contract in itself encompassing all of the terms and conditions of the base LTOP contract.

**4.** The abbreviation "FLTOP" is an acronym for Federal Lease to Ownership Plan and is synonymous here with the court's preferred term, "LTOP."

ant to [the buy-out provision of the contract].

\* \* \* \* \* \*

Machines leased under the CPT FLTOP may not be discontinued during a fiscal year except by the Contracting Officer exercising the provisions of "Termination for Convenience of the Government." (41 C.F.R. 1–8.701, F.P.R. 1–8.701).

\* \* \* \* \* \*

In the event the Government desires, at any time prior to the expiration date of the CPT FLTOP, to acquire title to a machine leased hereunder, the Government may make a one-time lump sum payment. The lump sum payment shall be computed by CPT in accordance with the formula ... [herein].

The 1983 report of the House of Representatives on the Department of Defense FY 1984 appropriation strongly criticized automated data processing equipment LTOP's as uneconomical and required that defense agencies discontinue LTOP delivery orders forthwith and purchase needed equipment outright. The Committee's Report was prefaced with "[a] partial listing of examples of uneconomical leasing [by] DoD [characterized as] a litany of waste and mismanagement." [5] Congress mandated termination of the LTOP's as quickly as could be done, taking into consideration the availability of funds and the possibility that economically, it might be more feasible or otherwise necessary, in a few instances, to continue some delivery orders.[6] Thereafter, defendant selectively terminated at least one LTOP delivery order for the convenience of the government and did not renew other delivery orders prior to completion of the full aggregate term of the delivery orders.

In mid–1984 Shaw Air Force Base issued a delivery order for three CPT word processors against the FY 1984 base LTOP contract under a forty-eight month plan at a total monthly rental of $1,361. The annually funded delivery order terminated at the close of FY 1984 by its own terms and was renewed by defendant through FY 1985. However, in January 1985, Shaw issued a competitive solicitation for 125 units capable of performing functionally equivalent tasks to the CPT equipment. CPT participated in the competitive procurement and, as low bidder, was awarded the direct purchase contract for all 125 word processors but at a lower unit price than those ordered against the FY 1985 base LTOP contract. The 125 units purchased from CPT were in addition to the three units first acquired in the FY 1984 delivery order. After award of the purchase contract, defendant issued a notice of non-renewal of the delivery order to CPT effective at the end of FY 1985 without exercising the buy-out clause. Defendant stated that the direct purchase was not made at the insistence of Congressional influence but in the best interests of defendant to obtain word processors at the lowest possible price. CPT took the position that non-renewal of the delivery order was a breach of its contract because funds were constructively available and non-renewal was not in accord with the "Intent" provision; i.e., renewal of the delivery order through its aggregate term (FY 1988) or buy-out. Plaintiffs sought $42,916.87, the amount that remained due under the delivery order for a buy-out.

On February 28, 1984 the Los Angeles Air Station issued a delivery order against the then-current GSA general supply schedule contract for thirteen word processors, but within a few days changed the order by placing it against the FY 1984 forty-eight month base LTOP contract. The order was later extended twice for a total of ten months. Prior to the last extension, the Los Angeles Air Station contracting officer

---

**5.** Plaintiff explained at oral argument that defendant had three methods of acquiring word processors: (1) by purchase, the most expensive initially; (2) by direct year-to-year leases, less expensive than direct purchases; or (3) by LTOP, the least expensive, at least the parties thought.

**6.** In the FY 1985 appropriation, Congress stated that "[t]he Committee's guidance with regard to ADP Equipment should be applied to word processors which are simply automatic data processing equipment at the lower end of the capability spectrum."

notified CPT that the delivery order would not be renewed but, instead, terminated for the convenience of the government prior to the end of the FY 1985 delivery order. During the term of the FY 1985 delivery order, defendant directly purchased personal computers with word processing capability from Zenith Data Systems, Inc. When CPT asked why the delivery order had been terminated, the contracting officer replied, "for convenience of the government ... because the Government has been mandated to use a requirements contract with Zenith Data Systems for word processing machines."[7] Plaintiff asserted that the government's action, for the same reason, constituted a breach of the agreement for which plaintiff was entitled to $211,151.20, the amount remaining under the delivery order for a buy-out.

Nellis Air Force Base issued several delivery orders for CPT word processors against base LTOP contracts in Fiscal Years 1984 and 1985, which were subsequently renewed, respectively, in FY 1985 and 1986. At the end of FY 1986, defendant elected to buy-out some CPT equipment and not renew others. The latter were replaced with Zenith personal computers. Defendant's stated reason for partial non-renewal of the delivery orders was the Congressional mandate, and that economically it would be more advantageous not to renew some of the delivery orders but, instead, replace them with purchased Zenith personal computers. CPT asserted breach of contract and claimed $197,713.35, the amount that remained due under the delivery orders for a buy-out.

Davis–Monthan Air Force Base placed several delivery orders for CPT word processors against the FY 1985 base LTOP contract and renewed them in FY 1986. However, in FY 1986 the contracting officer was informed that funds would not be available to renew the delivery orders in FY 1987 and instructed to determine which units should be bought-out and which should not be renewed at the close of FY 1986. Subsequently, some CPT word pro-

cessors were bought-out and others not renewed for the following fiscal year. CPT again asserted a breach and submitted a claim for the non-renewed delivery orders in the amount $90,006.61, the amount that remained under the delivery orders for a buy-out.

## DISCUSSION

Summary judgment is the wholly acceptable and favored procedural means for disposing of a case where there are no genuine issues of material fact in dispute. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Sweats Fashions, Inc. v. Pannill Knitting,* 833 F.2d 1560 (Fed.Cir.1987). Not every fact in dispute before the court on a motion for summary judgment rises to the level of a genuine issue of material fact sufficient to preclude summary judgment. It is the law of the Federal Circuit, that "mere denials or conclusory statements" by the non-moving party are not sufficient to preclude summary judgment. *Mingus Constructors, Inc. v. United States,* 812 F.2d 1387, 1390–91 (Fed.Cir.1987) (citing *Barmag Barmer Maschinenfabrik A G v. Maruta Mach. Ltd.,* 731 F.2d 831, 836 (Fed. Cir.1984)).

> When the moving party has carried it's burden under [RUSCC] 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.... In the language of the Rule, the nonmoving party must come forward with "specific facts showing that there is a *genuine issue for trial....* Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, · there is no 'genuine issue for trial.'"

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (citations omitted) (emphasis in original).

Of the four delivery orders before the court, all were ordered first in FY 1984 and

---

7. As late as mid–1986 defendant stated "[t]he extent to which this conclusion resulted from Congressionally-directed cost analysis is unclear at this time."

1985. One was terminated for the convenience of the government during FY 1985 (Los Angeles Air Station), part of two were not renewed and part bought-out at the end of FY 1986 (Davis–Monthan and Nellis Air Force Bases) and, in one instance, the delivery order was not renewed at the end of FY 1985 (Shaw Air Force Base). CPT's total claim of $541,788.13 is for all delivery orders not renewed and not bought-out by defendant prior to completion of the aggregate terms of the delivery orders. Plaintiff argued that defendant breached its contracts because funds were available for word processors capable of performing functionally equivalent tasks and, instead of continuing to lease its equipment or buy-out, defendant either terminated the delivery orders or permitted them to expire by their own terms at the end of a fiscal year prior to the full "Intent" clause aggregate term. In all instances plaintiff attempted to resell the word processors but found no market for them.[8]

That plaintiff completely understood the prohibition against defendant contractually obligating itself prior to appropriation of funds by the Congress is not in doubt.[9] It was, in fact, this stricture that led to adoption of the negotiated "Intent" clause language as opposed to the unrestricted multiyear obligation that GSAI/CPT initially requested. The parties do not dispute that the delivery orders were placed using annual appropriations, and as such, could not extend beyond the fiscal year in which the orders were placed. Plaintiff cited several cases for the proposition that defendant can contractually obligate itself to annually renew LTOP delivery orders if the only condition precedent is necessary funding. *Goodyear Tire & Rubber Co. v. United States*, 276 U.S. 287, 48 S.Ct. 306, 72 L.Ed. 575 (1928); *Leiter v. United States*, 271 U.S. 204, 46 S.Ct. 477, 70 L.Ed. 906 (1926); *Bradley v. United States*, 98 U.S. 104, 114, 25 L.Ed. 105 (1878). The court is unable to

find that *Bradley, Leiter,* or *Goodyear* provide any authority or precedent for that premise. All three turn on the well-established rule of law that defendant may exercise an option to continue an option contract for a following fiscal year if funding is available and the contracting officer affirmatively acts to extend the term of the contract.

■ Plaintiff characterized the base LTOP contracts as carefully drafted conditional sales contracts to be binding upon defendant within the restraints of the Antideficiency Act. Defendant disagreed. Defendant defined the delivery orders as ordinary option contracts whereby the government could preserve a supply source at a fixed cost for a period of years by eliciting agreement from a supplier to provide the government with its equipment on a year-to-year basis, but with an absolute reservation by the government to not exercise the option to renew the lease for the following year by (1) permitting it to expire by its own terms at the end of the fiscal year, or (2) terminating the lease at anytime during the fiscal year for the convenience of the government.

Defendant cited to *Leiter v. United States*, 271 U.S. 204, 46 S.Ct. 477, 70 L.Ed. 906 (1926), to support its position that the option years could be non-renewed at no cost to the government. In *Leiter*, the court held:

> A lease to the Government for a term of years, when entered into under an appropriation available for but one fiscal year, is binding on the Government only for that year.... And it is plain that, to make it binding for any subsequent year, it is necessary, not only that an appropriation be made available for the payment of the rent, but that the Government, by its duly authorized officers, affirmatively continue the lease for such subsequent

---

**8.** Most of the CPT word processors were "Tempest" models having specially designed software to prevent unauthorized persons from gaining access to information stored in them.

**9.** The Antideficiency Act, 31 U.S.C. § 1341, precludes the obligation of funds exceeding the

amount appropriated by the Congress for that need. *See Leiter v. United States*, 271 U.S. 204, 206–07, 46 S.Ct. 477, 478, 70 L.Ed. 906 (1926); *Pacificorp Capital, Inc. v. United States*, 15 Cl.Ct. 663 (1988).

year; thereby, in effect, by the adoption of the original lease, making a new lease under the authority of such appropriation for the subsequent year.

*Id.* at 207, 46 S.Ct. at 478 (citations omitted). Defendant asserted that plaintiff's argument—to automatically extend the delivery orders for subsequent years subject only to the actual or constructive availability of funds—ignored the contract language that "notice" to renew a lease does not by itself renew the lease. More was needed. That extra requirement was an act by a contracting officer to exercise the option by actually renewing the delivery orders against the following fiscal year base LTOP contract. The court cannot dispute the established premise that only when funds are available, *i.e.*, appropriated and allocated, and after the government acts to exercise its option, would the government be bound. A failure by the contracting officer to renew an option when not obligated to do so would render the contract and the option a nullity. *See Goodyear Tire & Rubber Co. v. United States*, 276 U.S. 287, 48 S.Ct. 306, 72 L.Ed. 575 (1928); *Leiter v. United States*, 271 U.S. 204, 46 S.Ct. 477, 70 L.Ed. 906 (1926); *Government Sys. Advisors, Inc. v. United States*, 847 F.2d 811 (Fed.Cir.1988). Defendant's argument, however, missed the point at issue. The Intent clause stated not only that defendant shall give notice to renew but that it shall renew; "[a]ctual renewal shall occur annually throughout the aggregate contract term, subject to the availability of funds." Moreover, the Intent clause defined each contract as an "ownership arrangement." Thus, argued plaintiff, the delivery orders were not ordinary option contracts.

The interpretation of a government contract is a matter of law, not fact, *Hol–Gar Mfg. Corp. v. United States*, 169 Ct.Cl. 384, 351 F.2d 972 (1965), and the court is bound to interpret a contract by the plain reasonable meaning of the language used, *Firestone Tire & Rubber Co. v. United States*, 195 Ct.Cl. 21, 444 F.2d 547 (1971), so as to give meaning to all parts of the contract and not render a portion meaningless. *Fortec Constructors v. United States*, 760 F.2d 1288 (Fed.Cir. 1985). Moreover, the actions of defendant under these circumstances must be viewed as if the government were a private enterprise, with exceptions not pertinent here. Whenever the United States casts off its cloak of sovereign immunity to engage in a business-type activity with a business-minded purpose, it must be treated as engaging in commercial activities and comply with the usual and ordinary responsibilities and duties of a private commercial contractor. *Standard Oil v. United States*, 267 U.S. 76, 45 S.Ct. 211, 69 L.Ed. 519 (1925); *Loeffler v. Frank*, 486 U.S. 549, 108 S.Ct. 1965, 100 L.Ed.2d 549 (1988) (citing *Library of Congress v. Shaw*, 478 U.S. 310, n. 5, 106 S.Ct. 2957, n. 5, 92 L.Ed.2d 250 (1986)). A court interpreting a contract also must "examine the reasonableness of the business transaction in order to determine which of several [potentially] competing interpretations is most reasonable and likely under the total circumstances including the business realities of the case." *Consumers Ice Co. v. United States*, 201 Ct.Cl. 116, 475 F.2d 1161, 1167 (1973). As stated in *Torncello v. United States*, 231 Ct.Cl. 20, 681 F.2d 756, 762–63 (1982):

> The government contracts as does a private person, under the broad dictates of the common law. "When the United States enters into contract relations, its rights and duties therein are governed generally by the law applicable to contracts between private individuals." *Lynch v. United States*, 292 U.S. 571, 579 [54 S.Ct. 840, 843, 78 L.Ed. 1434] (1934); *Perry v. United States*, 294 U.S. 330 [55 S.Ct. 432, 79 L.Ed. 912] (1935). While it is true that the government has the power to abrogate commonlaw contract doctrines by specific legislation, *see, e.g.*, the First War Powers Act, 1941, Pub.L. No. 77–354, 55 Stat. 838 (power to the President to authorize agencies to enter into contracts "without regard to the provisions of law relating to the making, performance, amendment, or modification of contracts," 55 Stat. 839) ... the general rule must be that common-law contract doctrines limit the government's

power to contract just as they limit the power of any private person. Thus, the government's entry into the field of contracts is not like its selective creation of rights and entitlement in other fields. As we have explained, statutes and regulations in other fields circumscribe a prospective plaintiff's recovery strictly. If, however, a plaintiff's action or recovery purportedly is limited by a contractual term, that limitation will stand only if allowable under the doctrines of contract. Indeed, the Supreme Court has held as early as 1923 that the government may not, by simple contract, reserve to itself a power that exceeds that which a private person may have. *Willard, Sutherland & Co. v. United States*, 262 U.S. 489 [43 S.Ct. 592, 67 L.Ed. 1086] (government may not reserve to itself a right of non-performance without destroying the contract). And it does not matter that a contract term is mandated by federal procurement regulation. In the field of contracts, it is only by specific legislation that the government may trespass the bounds of general contract doctrines.

In interpreting the delivery orders at issue, the court concludes, as a matter of law, that those documents were conditional sales contracts. The clearly expressed purpose of each delivery order was for defendant to take title to the word processors after completion of a condition precedent, *i.e.*, a series of specified monthly payments, or buy-out. The contract language cannot reasonably be interpreted to create an unqualified lease with a series of options to renew with title remaining at all times with plaintiff.

Beginning with *United States v. Corliss Steam–Engine Co.*, 91 U.S. 321, 23 L.Ed. 397 (1876), the government's exercise of its right to terminate any contract for convenience was unquestioned, and historically termination for convenience clauses were required to be present in all significant government contracts, as here. 48 C.F.R. § 502; *see Paul v. United States*, 371 U.S. 245, 255, 83 S.Ct. 426, 433, 9 L.Ed.2d 292 (1963). The right to terminate a contract for the convenience of the government has

been viewed as so vital that if the termination for convenience clause is required to be in a contract and, if not actually set forth, it will be inserted as a matter of law just as if it had been physically present in the contract from the outset. *See G.L. Christian & Assocs. v. United States*, 160 Ct.Cl. 1, 312 F.2d 418, *cert. denied*, 375 U.S. 954, 84 S.Ct. 444, 11 L.Ed.2d 314 (1963).

Erosion of the one hundred year old principle that termination for convenience could be utilized in any circumstance without serious question was exemplified in *John Reiner & Co. v. United States*, 163 Ct.Cl. 381, 325 F.2d 438 (1963), and first surfaced in this court in *Municipal Leasing Corp. v. United States*, 1 Cl.Ct. 771 (1983). In *Torncello v. United States*, 231 Ct.Cl. 20, 681 F.2d 756 (1982), Judge Marion T. Bennett, now sitting on the United States Court of Appeals for the Federal Circuit, penned a scholarly history of termination for convenience bound to the concept of risk allocation. In so doing, Judge Bennett discussed a series of pre–1971 cases identified as applying the termination for convenience concept only where there was "some change from the parties' original bargain and was not to be applied as broadly as an untutored reading of the work [the regulations and clause] might suggest." *Torncello* went on to explain that the court in one case, *Colonial Metals v. United States*, 204 Ct.Cl. 320, 494 F.2d 1355 (1974), had drifted from the limited application of a termination for convenience based on risk allocation. *Colonial Metals* permitted the government to terminate a contract for convenience in order to make award to a second contractor for a reason that was known, or should have been known, to the government before the first contract had been awarded. The commentators of the day were not satisfied with *Colonial* but concluded "that there are virtually no limitations on the Government's right to terminate for convenience." *Torncello*, 681 F.2d at 767 (quoting 10 Pub.Cont.L.J. 1, 6 (1978)). That conclusion, however, was premature. The broad *Colonial* approach has not been often followed. Mostly, it has

been distinguished or simply ignored. Its niche in federal common law is at this time so infinitesimal as to be non-existent. *John Reiner & Co. v. United States*, 163 Ct.Cl. 381, 325 F.2d 438 (1963), is the law of this circuit.

In *Municipal Leasing Corp. v. United States*, 1 Cl.Ct. 771 (1983), 7 Cl.Ct. 43 (1984), a case strikingly similar to the present action, the contract bound the government to a three-year LTOP delivery order conditioned upon the functionally equivalent task/constructive funding caveat. After the first year of the delivery order the government chose to refurbish existing equipment it already owned instead of renewing the delivery order and thus, by administrative fiat, made no funds available for the delivery order. *Municipal Leasing* found for plaintiff on the ground that the delivery order required the government to use its best efforts to obtain subsequent-year fiscal funding and that defendant had made no effort to do so whatsoever. Defendant argued that even though it had not sought funding, the contract was not necessary to its needs and that by not funding the delivery order for the second fiscal year, it had constructively terminated the contract for convenience.[10] *Municipal Leasing* found the central issue to be whether the circumstances were so changed as to justify a termination for convenience. The court concluded:

> The termination for convenience clause can appropriately be invoked only in the event of some kind of change from the circumstances of the bargain or in the expectations of the parties. *Municipal Leasing Corp. v. United States*, 1 Cl.Ct. 771, 774–75 (1983); *Torncello v. United States*, [231 Ct.Cl. 20, 681 F.2d 756 (1982)]. In this instance, the government promised that it would not replace the leased terminals with functionally equivalent equipment. Repairing the Hazeltines essentially replaced the Intecolor terminals. Not only did the Air Force substitute the use of the Intecolor

terminals with the Hazeltines, but Hazeltine repair was considered as an alternative prior to contracting with Municipal. The termination for convenience clause will not act as a constructive shield to protect defendant from the consequences of its decision to follow an option considered but rejected before contracting with plaintiff. *See Torncello v. United States*, [231 Ct.Cl. 20, 681 F.2d 756 (1982)].

*Municipal Leasing*, 7 Cl.Ct. at 47. In *Torncello*, the Court of Claims explained:

> We hold in this opinion only that the government may not use the standard termination for convenience clause to dishonor, with impunity, its contractual obligations ... [and that] we must read the termination for convenience clause ... to require some kind of change from the circumstances of the bargain or in the expectation of the parties.

*Torncello*, 231 Ct.Cl. 20, 681 F.2d at 772.

In the present action, defendant bluntly stated that it intentionally had not allocated FY 1986 and 1987 funds for the renewal of the delivery orders for CPT word processors through the LTOP process even though funds for the acquisition of equipment capable of performing functionally equivalent tasks had been appropriated. It is obvious from the record that the Congressional directive was the principal driving force behind defendant's non-renewal of the annually funded delivery orders based upon a lack of funds as satisfaction of the condition precedent of actual or constructive funding and thus, justification to not renew.

▮ The court is not tasked with the responsibility of determining the wisdom of defendant in relinquishing its valuable right to "end" a contract by not exercising its option to renew, but is satisfied that, within limits, it may do so. The consideration given by plaintiff for defendant's relinquishment of the right to terminate by non-renewal was the lower monthly unit

**10.** "Constructive termination for convenience is a judge-made doctrine" that allows an actual breach by the government to be retroactively justified. *Maxima Corp. v. United States*, 847 F.2d 1549, 1553 (Fed.Cir.1988). It must be used sparingly and only in the most egregious circumstances.

cost defendant paid for the equipment *vice* an ordinary lease or option contract. Absent consideration, defendant's partial relinquishment of its right to terminate by non-renewal would be a nullity.

 Of the delivery orders presented to the court, only one, the Los Angeles Air Station delivery order, was terminated for the convenience of the government. In this circuit, the termination for convenience clause may be invoked if there is a "change in the circumstances of the bargain or expectation of the parties." *Municipal Leasing v. United States*, 1 Cl.Ct. 771 (1983); *Torncello v. United States*, 231 Ct.Cl. 20, 681 F.2d 756 (1982). There is a dearth of law defining the phrases "change in the circumstances of the bargain" and "expectation of the parties;" however, two recent Claims Court decisions provide guidance in the interpretation of those phrases. *See Salsbury Indus. v. United States*, 17 Cl.Ct. 47 (1989); *Embrey v. United States*, 17 Cl.Ct. 617 (1989). In *Salsbury* this court was faced with a dispute over whether the circumstances had changed when the government was directed by a United States district court to award a portion of a contract to a bidder whose bid had been improperly rejected. Defendant previously had awarded its entire annual need to Salsbury Industries, Inc. and was forced to terminate part of that contract for convenience in order to make an award to the other bidder. Salsbury argued that it was innocent of any wrongdoing and that termination for convenience was improper. The court found a "change in the circumstances" sufficient to justify the termination for convenience predicated upon the district court's mandate to award a contract to the other bidder coupled with the government's inability to purchase more than its fiscal year needs. *Embrey* found that unsatisfactory performance coupled with a deterioration of the business relationship between the government and its contractor constituted a change in the circumstances of the bargain and the expectations of the parties sufficient to justify termination for the convenience of the government.

We find an initial similarity between *Salsbury* and the Los Angeles Air Station delivery order that had been terminated for the convenience of the government as a result of defendant's understanding of the Congressional mandate to terminate LTOP delivery orders "as quickly as could be done" and, impliedly, if needed, purchase equipment capable of performing functionally equivalent tasks at a lower cost and under a different form of contract. In the opinion of the court, that Congressional mandate constituted a "change in the circumstances of the bargain and expectations of the parties" sufficient to justify defendant's termination for convenience in spite of a statement allegedly made over two years later, after it had become obvious that CPT would file a claim for breach of contract, that Congress' directive to terminate DoD LTOP delivery orders was "unclear." *Torncello v. United States*, 231 Ct.Cl. 20, 681 F.2d 756 (1982), merely "requires that the events that provoke the government's conclusion that termination is in its best interest be unexpected, *i.e.*, inconsistent with the assumptions of the parties when they entered the contract." *Salsbury Indus. v. United States*, 17 Cl.Ct. 47, 58 (1989), *aff'd*, 905 F.2d 1518 (Fed.Cir. 1990). Under the circumstances outlined above, the termination for convenience procedure was properly used in this instance.

 A close examination of the facts, however, led to the discovery that the Los Angeles Air Station delivery order had been materially breached by defendant at the very outset. The initial delivery order for the lease of CPT word processors had been placed against a GSA general supply schedule contract on February 28, 1984 but, on March 9 of that year, the general supply schedule delivery order was converted by defendant to a delivery order against the FY 1984 CPT base LTOP contract. The aggregate term of the initial delivery order had not been changed, only the form of contract. The delivery order had a seven-month term, through September 28, 1984, *i.e.*, two days prior to the close of FY 1984, whereas the base LTOP contract stipulated that the initial delivery order was to be effective until the close of

the fiscal year in which it was issued. Plaintiff accepted the delivery order nonetheless. On September 17, 1984, before the first order had expired, the Los Angeles Air Station contracting officer renewed the first delivery order against either the FY 1984 or 1985 base LTOP contract for a term of five months followed by yet another five-month delivery order against the FY 1985 base LTOP contract.[11] Plaintiff accepted all three delivery orders even though it had been told prior to the second extension that the delivery orders would be terminated for the convenience of the government and the word processors replaced with personal computers purchased from Zenith Data Systems, Inc.

■■■ The material breaches did not automatically terminate the delivery order. Either breach gave plaintiff only the right to refuse the delivery order. At the time of the initial delivery order, or at the least, at the time of the first renewal, plaintiff could have chosen to refuse or accept the delivery order.[12] Had plaintiff chosen to refuse the delivery order, both parties would have been relieved of their further obligations. Once plaintiff elected to continue the delivery order, however, the contractual obligations of both parties remained in full force. *See Airco, Inc. v. United States*, 205 Ct.Cl. 493, 504 F.2d 1133, 1135–37 (1974); *Ling–Temco–Vought, Inc. v. United States*, 201 Ct.Cl. 135, 475 F.2d 630, 636–39 (1973); *Northern Helex Co. v. United States*, 197 Ct.Cl. 118, 455 F.2d 546, 551 (1972); *De Vito v. United States*, 188 Ct.Cl. 979, 413 F.2d 1147, 1153–54 (1969); *Acme Process Equip. Co. v. United States*, 171 Ct.Cl. 324, 347 F.2d 509, 515–16 (1965), *rev'd on other grounds*, 385 U.S. 138, 87 S.Ct. 350, 17 L.Ed.2d 249

(1966). Under a reasonable application of the election or waiver doctrine, any act indicating an intent to continue the contract is an election, and an election to continue may occur simply by failure of the injured party to take action to end the agreement within a reasonable time after becoming aware of the facts. 5 Williston on Contracts 683–85 (3d ed. W. Jaeger 1961); 17 Am.Jur.2d. Contracts 447, 510 (1964). Under that view, if performance continues, the right to end the contract cannot be preserved even by explicit expression of intent by plaintiff. Any inconsistent act would result in the loss of the right unless the breaching party assented to the aggrieved party's retention of the right, 5 Williston, *supra* at 683–85; 17 Am.Jur.2d, *supra* at 447, 510. The continued acceptance of benefits under the contract is the most common and clearest case of election by contract. *See, e.g., Cities Serv. Helex, Inc. v. United States*, 211 Ct.Cl. 222, 543 F.2d 1306 (1976). The court cannot ignore the fact that plaintiff enjoyed the benefits of the delivery order for almost seventeen months. Nor can plaintiff belatedly be heard to cry breach. The time for that is long past. The result of this convoluted chain of events was that the Los Angeles Air Station delivery order against the FY 1985 base LTOP contract was valid until the day defendant terminated the delivery order for convenience. Inherent in this conclusion is a finding that the Los Angeles Air Station contracting officer executed the LTOP delivery order with the intent to complete the aggregate contract term. This is exemplified by the fact that the Air Station first leased the word processors against a GSA general supply schedule contract but within a matter of days changed the delivery order to place it against the

11. If the first renewed delivery order placed by the Los Angeles Air Station was against the FY 1984 base LTOP contract it was in violation of the Antideficiency Act because it obligated FY 1984 annual funds partially for FY 1985 needs. It continued the delivery order past the end of FY 1984 and into FY 1985. If the delivery order was against the FY 1985 base LTOP contract it was a breach of the FY 1985 contract because the contract required that renewed delivery orders were to be effective from the beginning of the following fiscal year, *i.e.*, September 1, 1985, through the end of the fiscal year. But, that issue is not before the court nor does it affect the outcome of the case.

12. The court is of the opinion that by the time of the second extension the die had been cast and plaintiff had forever waived its right to end the FY 1984 and 1985 delivery orders.

FY 1984 base LTOP contract.[13] It is inconceivable that defendant was unaware of one of the key provisions of the CPT base LTOP contract. It consciously and deliberately terminated its order against the GSA general supply schedule contract and placed the identical order against the CPT base LTOP contract. The Los Angeles Air Station contracting officer must have known, or at the very least should have known, of the key provisions of the base LTOP contract. Moreover, this court must presume that the Los Angeles Air Station contracting officer "discharge[d his] duties correctly, lawfully, and in good faith." *Hoffman v. United States*, 16 Cl.Ct. 406, 410 (1989) (citing *Guy v. United States*, 221 Ct.Cl. 427, 608 F.2d 867 (1979)). "It takes well-nigh irrefragable proof to overcome [this] presumption." *Sanders v. United States Postal Serv.*, 801 F.2d 1328, 1331 (Fed.Cir.1986) (citations omitted); *see also Knotts v. United States*, 128 Ct.Cl. 489, 121 F.Supp. 630 (1954). An argument could be made that defendant did not act in good faith at the Los Angeles Air Station because of the odd terms of the delivery order, but the court believes that that argument would be insufficient to overcome the extremely high standard of proof necessary to show bad faith of a government officer in the discharge of his duty. Regardless, even if that standard could be reached, the result would be for naught because of plaintiff's waiver of the breach.

The other three LTOP delivery orders at issue here invoke the consideration of different issues. In those instances defendant chose not to renew most all of the delivery orders in FY 1986 and renewed none of the orders that remained in FY 1987 "thereby," according to counsel for defendant at oral argument, "permitting each [delivery order] to die of its own terms at the end of the fiscal year." The only proper interpretation the court can draw from the language of the delivery orders first made in FY 1984 and 1985 is that defendant agreed for sufficient consideration (the lesser LTOP monthly cost), to relinquish its right to terminate the delivery orders by non-renewal at the end of a fiscal year so long as funds were available either directly or constructively as provided by the terms of the Intent clause.[14] As a matter of law the government, within reason, may relinquish a contract right generally reserved for its benefit or, in some limited manner, narrow the scope or application of some usual right.[15] As a matter of contract interpretation, giving weight and meaning to all provisions of the contract, *Firestone Tire & Rubber Co. v. United States*, 195 Ct.Cl. 21, 444 F.2d 547 (1971), the court finds that defendant was contractually obligated to renew the Shaw, Nellis, and Davis—Monthan Air Force Bases delivery orders against the FY 1984 and 1985 base LTOP contracts so long as funding was available for the purchase of equipment capable of providing functionally equivalent tasks. However, the mutual

13. Solely for the benefit of the parties in their handling of the remaining claims outside of the scope of this partial cross-motion for summary judgment, the court believes that, had defendant executed delivery orders against the base LTOP contract in full compliance with all the terms and conditions of that contract, the outcome would be the same, albeit, arrived at less tortuously. Defendant never relinquished its right to terminate any of the delivery orders for convenience at any time during the terms of the delivery orders. This conclusion is based upon the fact that the termination for the convenience of the government was driven by the congressional mandate to terminate LTOP's in the Department of Defense thereby justifying use of that procedure, as limited by *Torncello v. United States*, 231 Ct.Cl. 20, 681 F.2d 756 (1982), and *Municipal Leasing Corp. v. United States*, 7 Cl.Ct. 43 (1984).

14. It is reported that the GSA contracting officer for the base LTOP contracts "knew" that the terms of the Intent clause were improper and unenforceable and, if it came to issue, would confess error and plead nonenforceability by plaintiff. It will come as a surprise, no doubt, to the contracting officer to learn that he did, in fact, have such authority.

15. The decision does not run afoul of *G.L. Christian & Assocs. v. United States*, 160 Ct.Cl. 1, 312 F.2d 418 *cert. denied*, 375 U.S. 954, 84 S.Ct. 444, 11 L.Ed.2d 314 (1963), because there the court read a missing required clause into the contract by operation of law. It did not forbid the modification of a non-required clause.

agreement of the parties to change the provisions of the Intent clause in the FY 1986 and 1987 base LTOP contracts significantly changed the rights and obligations of the parties.

■ The Intent clause of the FY 1983–1985 base LTOP contracts contained four sentences. The first two read: "It is understood by all parties to this contract that this is an ownership arrangement, that is[,] a lease to title contract. In that regard, the Government, as lessee, contemplates fulfilling that agreement." The third sentence stated that "[f]urther the Government intends not to terminate this contract prior to completion of its specified Aggregate Contract Term." The second and third sentences are both fully tempered with contractually nonbinding terms such as "contemplates" and "intends." The fact that defendant "contemplated" or "intended" to perform a certain act may presuppose a moral commitment by defendant but is contractually unenforceable, at the least without more. The fourth sentence stated that it was the government's intent "not to terminate the contract for non-avalability [sic] of funds if funds are available during the Aggregate Contract Term to pay for functionally equivalent tasks for which CPT equipment have [sic] been acquired." Following deletion of the third and fourth sentences, the Intent clause read: "It is understood by all parties to this contract that this is an ownership arrangement, that is[,] a lease to title contract. In that regard, the Government, as lessee contemplates fulfilling that requirement." The change removed the FY 1983–1985 contractual caveat of constructive funding of the CPT delivery orders if there were any available funds for the acquisition of equipment capable of performing functionally equivalent tasks, which had theretofore constructively deemed the CPT delivery orders funded and the government required to renew the delivery orders to aggregate term. This is the case notwithstanding the second sentence of the Intent clause, that "the Government … contemplated fulfilling that agreement," because the deletion of the more specific fourth sentence, *i.e.,* that the government intended "not to ter-

minate the contract for non-avalability [sic] of funds if funds are available during the Aggregate Contract Term to pay for functionally equivalent tasks for which CPT equipment have [sic] been acquired" was controlling and the deletion of that sentence robbed the second sentence of any enforceable substantiality that it may have had. In any event, the "requirement" of the second sentence was met when the FY 1984 and 1985 delivery orders were first made. The government did, at that time, "contemplate fulfilling the agreement."

The delivery orders were conditional sales contracts and the bargain struck by the parties was expressed in the fiscal year base LTOP contract against which each delivery order was initially made and could not be changed by defendant without consideration flowing to, or agreement of, plaintiff. With each delivery order first made against a base LTOP contract, all matters remaining unchanged, plaintiff properly could assume that the rights and obligations of the parties were established for the aggregate term of each delivery order whether it be for twenty-four, thirty-six or forty-eight months. For example, a delivery order made against the FY 1984 base LTOP contract ordinarily would be governed by the terms of that contract through the aggregate term of the delivery order *unless* the underlying subsequent fiscal year base LTOP contracts against which the renewals would have to be made were expressly changed by the agreement of both parties. Delivery orders first issued against the FY 1986 or 1987 base LTOP contracts would be governed by the abbreviated terms of the Intent clause in those fiscal year base LTOP contracts. That is, defendant could, in any subsequent fiscal year, simply not fund the CPT delivery orders despite the presence of funding for the acquisition of other equipment capable of performing functionally equivalent tasks and, accordingly, be under no obligation to renew delivery orders first made in FY 1986 and 1987 to aggregate term.

The same interpretation of the Intent clause is equally applicable to renewals in FY 1986 and 1987 of delivery orders first

placed in FY 1984 and 1985. By the amendment to the Intent clause in FY 1986 and 1987, defendant effectively assumed unilateral control over the right to renew the CPT delivery orders or to look to another vendor for equipment capable of performing functionally equivalent tasks. In FY 1986 and 1987, defendant could make funds available for the purchase of equipment from other vendors capable of performing functionally equivalent tasks without subjecting itself to constructive funding of the FY 1984 and 1985 CPT delivery orders, and the concomitant obligation to renew the CPT delivery orders. Defendant did fund and renew some of the FY 1984 and 1985 CPT LTOP delivery orders in FY 1986 but it was no longer under any contractual obligation to do so because the causative language in the fourth sentence of the Intent clause of the FY 1984 and 1985 base LTOP contracts was not a term or condition of the FY 1986 and 1987 agreements.

An argument could be made that the terms of the delivery orders following the amendment of the Intent clause were ambiguous. The court, however, can find no merit to the argument. The question of whether a contract is ambiguous is a matter of interpretation and contract interpretation is strictly a matter of law. *Fortec Constructors v. United States*, 760 F.2d 1288, 1291 (Fed.Cir.1985). A contract may be found to be ambiguous only if the provision under scrutiny by the court reasonably may be interpreted in at least two ways. *Sun Shipbuilding & Dry Dock Co. v. United States*, 183 Ct.Cl. 358, 393 F.2d 807, 815–16 (1968). The court can find no reasonable ambiguity in either Intent clause. Their meanings are clear and have been discussed extensively elsewhere in this opinion and need not be repeated here. The amendment was extremely significant as plaintiff must have been fully aware, and plaintiff played a significant role in the amendment. Moreover, plaintiff could have refused to execute the FY 1986 and 1987 base LTOP contracts but chose not to, notwithstanding the significant change to the Intent clause. Arguendo, even if the language of the FY 1986 and 1987 Intent clause were found reasonably to be ambiguous the ambiguity would be patent. The test of patent versus latent ambiguity depends not upon the knowledge of plaintiff, but the obviousness of the discrepancy in the terms of the contract, *Chris Berg v. United States*, 197 Ct.Cl. 503, 455 F.2d 1037, at 1045 (1972). A patent ambiguity imposes a duty upon plaintiff to seek clarification. Plaintiff apparently sought no clarification of the amended Intent clause either at the time it accepted or approved the amendment, or any time thereafter. Plaintiff thus forfeited any opportunity to rely upon its unilateral interpretation of the modified language. *Cherry Hill Sand and Gravel Co. v. United States*, 8 Cl.Ct. 757, 762 (1985); *MWK Int'l., Ltd. v. United States*, 2 Cl.Ct. 206, 210 (1983).

## CONCLUSION

For the reasons stated above, the court finds that defendant properly terminated the Los Angeles Air Station contract for the convenience of the government and was within its contractual rights, as amended, to not renew the CPT FY 1984 and 1985 delivery orders in FY 1986 and 1987. This Order is limited to a determination of liability as issues of costs and damages have not been presented to the court. It would appear safe, however, to say that costs for the termination for convenience by the Los Angeles Air Station of its FY 1984 delivery order are to be determined as would any costs arising from any proper termination for the convenience of the government. The court cannot at this time say whether plaintiff is entitled to any damages for the non-renewal of the FY CPT delivery orders. Plaintiff's motion for partial summary judgment is denied. Defendant's cross-motion for partial summary judgment is allowed.

The court also considered defendant's motion to strike the affidavits of Messrs. Norton and Beale of GSAI as irrelevant. The court found that they did not add to an understanding of the case and were repetitive of facts made known to the court in other documents and at oral argument. The affidavits were not used in preparation

of this decision. Defendant's motion to strike is allowed.

The parties are instructed to negotiate the cost of the termination for the convenience of the government at the Los Angeles Air Station and to file a joint notice or stipulation of settlement no later than October 26, 1990. If no settlement has been agreed upon by that time, the court will call a conference to set a date for trial on quantum. If plaintiff believes it is entitled to damages for the non-renewal of the delivery orders, it shall discuss that matter with defendant, attempt to agree, and report the outcome of those discussions to the court on October 26, 1990.

IT IS SO ORDERED.